STATE OF NORTH CAROLINA v. FRANK PRUITT II

No. 30

(Filed 12 March 1975)

1. **Criminal Law § 76— on-the-scene investigation — no custodial interrogation — admissibility of defendant's statements**

    In a prosecution for arson and first degree murder, the trial court did not err in admitting into evidence defendant's response to questions asked him by a deputy sheriff at the scene of the crime since, at the time defendant made his statement, the deputy was engaged in a general on-the-scene investigation which was obviously directed to whether there were persons in the burning dwelling and there was nothing to suggest an in-custody interrogation or that the investigation had been focused upon defendant as the perpetrator of a crime; furthermore, substantially the same testimony had been given earlier without objection.

2. **Criminal Law § 75— Miranda warnings given — voluntariness of confession**

    Even though the technical procedural safeguards required by *Miranda* are recited by officers to a defendant, the ultimate test of the admissibility of a confession still remains whether the statement made by the accused was in fact voluntarily and understandingly made.

3. **Criminal Law § 76— Miranda warnings given — officers' language causing fear or hope — confession involuntary**

    Both oral and written confessions obtained from defendant were made under the influence of fear or hope or both growing out of the language and acts of those who held him in custody, and both were involuntary and improperly admitted in an arson and murder prosecution where the interrogation of defendant took place in a police-dominated atmosphere, officers repeatedly told defendant that they knew he had committed the crime, his story had too many holes in it, they knew he was lying and they did not want to fool around, this language was then tempered by statements that the officers considered defendant the type of person that such a thing would prey heavily upon, that defendant would be relieved to get it off his chest, and that it would simply be harder on defendant if he did not go ahead and cooperate.

APPEAL by defendant from *Canaday, J.*, at the 21 January 1974 Criminal Session of CUMBERLAND Superior Court.

Defendant was tried upon separate bills of indictment charging arson and the murders of Patricia Ellen Donlin, Christel Emmi Donlin, and Jeremiah William Donlin. The charges were consolidated for trial.

State v. Pruitt

The evidence for the State tended to show the following facts:

Staff Sergeant Jeremiah Donlin testified that on 9 October 1973, after talking with his wife, he left his home at 5107 Cannon Street, Fayetteville, about 3:10 a.m. He left his wife and his two sleeping children, Patricia Ellen Donlin, aged seven, and Jeremiah William Donlin, aged four, in the house. His wife and children were in good health. At that time his house had not been burned or charred in any way. Sergeant Donlin further testified that his wife often went out alone in the evening to play Bingo at the N.C.O. Clubs at Fort Bragg. They had "at least the normal amount of marital difficulties" and had sought marriage counseling on the base. Defendant and his wife, who lived in a trailer some sixty feet behind the Donlin house on a lot separated therefrom by a fence, often baby-sat the Donlin children.

Christy Sue Johnson, a next-door neighbor of the Donlins, testified that, about 7:00 a.m. on 9 October 1973, she was awakened by someone screaming "fire." Upon going outside, she observed that the Donlin house was on fire, and after talking with defendant's wife, she called the fire department.

Jimmy Goodman, Chief of the Bonnie Doone Fire Department, testified that, at 6:58 a.m. on 9 October 1973, he received a message that a house was on fire on Cannon Street. He arrived on the scene approximately two minutes later and discovered that the residence at 5107 Cannon Street was on fire "with flames and smoke rolling out of the house through the front door." The back corner of the house had already caved in. He encountered defendant, standing shirtless in the street in front of the house, and inquired whether people were still inside. Defendant replied, "She's in there on the couch. She's been raped and cut open and they've set her house on fire." After calling for further assistance, Goodman returned to try to enter the house and found defendant still standing in the street and "just yelling out of his head." In response to Goodman's question, defendant said that the children were in the back bedroom. Goodman crawled towards the front door of the house and was able to see a body about eight feet within but could not enter because of the fire.

After controlling the fire, he and others entered the front room, where they discovered a body in roughly a kneeling posi-

tion, the knees on the floor and the upper part of the body lying at an angle on the couch. Some twenty-five or thirty minutes later firemen were able to get into the back bedroom, where they discovered the charred bodies of two children and a small dog.

R. D. Cone of the State Bureau of Investigation, an expert in arson investigation and crime-scene analysis, testified that he went to the Donlin residence on 9 October 1973. He described the burned dwelling and related that a towel, rags, parts of a gown and housecoat, a pellet or air rifle with a portion of its stock missing, a gun stock, two knives, and a pair of scissors were found in the debris. They also obtained part of a railing from the fence separating the Donlin and Pruitt premises. Agent Cone testified that it did not appear that accelerants were used in starting the fire.

Robert Hallisey, a technician with the City-County Bureau of Identification, testified that about 7:00 a.m. he went to the scene of the fire, where he saw defendant and asked whether any people were still in the house. Defendant replied, "There's a woman in the house, she's been raped and stabbed, and the house is burning." He also testified concerning pictures he later made of the house and the bodies therein.

Cuyler L. Windham, Assistant Supervisor of the Fayetteville District for the S.B.I., testified that pursuant to defendant's consent he carried defendant to the Cape Fear Valley Hospital, where blood samples and fingernail clippings were taken from defendant. The blood samples and clippings were given to S.B.I. Agent Cone.

At this point it was stipulated that the three victims were pronounced dead on arrival at Cape Fear Valley Hospital on 9 October 1973. It was further stipulated that the bodies were removed from the hospital to the office of the Chief Medical Examiner of North Carolina in Chapel Hill, where Dr. Page Hudson, the State Medical Examiner, performed autopsies upon the bodies.

Laura Ward, a forensic serologist, testified that she received certain exhibits from Agent R. D. Cone and that her tests revealed the presence of Group "A" blood on portions of a towel, on a fatigue shirt, and on a pair of fatigue pants. She also found evidence of blood stains on another towel, on a fabric which appeared to be a part of a nightgown, on a piece of

quilted material, and on a pellet gun. The amounts of blood on the latter items were not sufficient to allow a detailed analysis. No blood was found on the fingernail clippings taken from defendant, the fence railing, the knives, or scissors found within the Donlin house. Her tests disclosed that both defendant and Mrs. Donlin had Group "A," Sub-group "A-1" blood.

Dr. Page Hudson, Chief Medical Examiner of North Carolina, testified that he conducted an autopsy on the body of Mrs. Donlin and the two children. He testified that there were at least three blows by a blunt-surfaced instrument on the left side of Mrs. Donlin's face and head and one "more significant" blow to the right side of her face. She had been manually strangled and stabbed three times in the abdomen and chest area with a sharp instrument. In his opinion, her death was caused by trauma to the head, and she was dead at the time her body was burned. In his opinion, both children died from thermal burns.

Detective Sergeant Conerly of the Cumberland County Sheriff's Department testified that he talked with defendant during the morning hours of 9 October 1973. Defendant told him that, upon observing the fire in the Donlin residence about 6:45 that morning, he told his wife to call the fire department. He then ran to the Donlin residence and attempted unsuccessfully to get into the house. He did not know whether the children were in the house at that time. He attempted to fight the fire until firemen arrived. Pruitt further related that an unidentified man had also been at the scene and had told him that there was a hole in Mrs. Donlin's head.

Approximately 5:00 p.m. on the same day, Sergeant Conerly and other officers went to defendant's trailer home, and defendant consented to a search of his premises.

Detective Lieutenant Charles D. Smith testified that he was present about 5:00 p.m. when defendant consented to a search of his trailer home. At that time, the officers found army fatigues in the closet of the rear bedroom. There were stains which appeared to be blood on the sleeves and front of the jacket and on the seat and both legs of the pants. The fatigues were seized, and defendant was arrested on charges of murder and arson. Defendant was carried to the Sheriff's Department, where he made a statement to the officers. At this point, defendant's counsel objected and moved to suppress the statement. The trial judge conducted a *voir dire* hearing, and, after finding

facts and concluding that the statement was made voluntarily, denied the motion to suppress. Officer Conerly then testified before the jury as to an inculpatory statement made by defendant. The contents of the statement and its admission into evidence will be more fully considered in the opinion.

Roy Starling, a Cumberland County Deputy Sheriff, testified that on 10 October 1973 he was a bailiff in Cumberland County District Court No. 2. On that day he and defendant, among other persons, were in the identification room of the jail, and defendant asked him who would take him to get his clothes. The witness testified that he told defendant he could not get his clothes because his house had burned down. Defendant replied, "No, that house belonged to the woman that I killed." This testimony was corroborated by Gerline Smith, a technician with the Identification Bureau who was also present and overheard this conversation.

Defendant offered no evidence.

The jury returned a verdict of guilty of murder in the first degree as to each of the murder indictments and a verdict of guilty to the arson indictment. Judge Canaday imposed the mandatory death sentence in each case. Defendant appealed.

*Robert Morgan, Attorney General, by Assistant Attorneys General William W. Melvin and William B. Ray, for the State.*

*Donald W. Grimes, attorney for defendant.*

BRANCH, Justice.

Defendant first contends that the trial court erred in denying his motions to quash each bill of indictment on grounds that the North Carolina statutes imposing the death penalty for the crimes charged are unconstitutional under the Eighth and Fourteenth Amendments to the Constitution of the United States. This Court considered and rejected this identical argument in *State v. Jarrette*, 284 N.C. 625, 202 S.E. 2d 721. *Accord: State v. Sparks*, 285 N.C. 631, 207 S.E. 2d 712; *State v. Honeycutt*, 285 N.C. 174, 203 S.E. 2d 844; *State v. Fowler*, 285 N.C. 90, 203 S.E. 2d 803; *State v. Dillard*, 285 N.C. 72, 203 S.E. 2d 6. This assignment of error is overruled on authority of these cases.

[1] Defendant next assigns as error the overruling of his objection to the admission into evidence of defendant's response

to questions asked him by Deputy Robert Hallisey at the scene of the fire. He relies upon a single paragraph from a written statement given by Fire Chief Goodman, which was offered into evidence solely to corroborate Goodman's testimony. The statement upon which defendant relies is as follows:

> "When I got the fire knocked down in the front, I turned and looked. The Rescue had arrived and the man that was standing in the street hollering was about a half block down the street. I called to the Rescue men to stop him, that I wanted to question him. Then the CID men arrived, and the Rescue men had him to take the man in custody and hold him. The next thing that I noticed was the Deputies had arrived on the scene and had this man in their car."

Deputy Hallisey testified that he arrived at the scene of the fire at 7:00 a.m. and talked with Fire Chief Jimmy Goodman. Hallisey further testified:

> ". . . Goodman told me the house was engulfed in flames and there might be people there. Chief Goodman said a subject who gave him some information was near a trailer and I went to the location and talked with him. I approached the man who was the defendant to get some information from him because I was actually the only deputy at the scene at that time.
>
> I was concerned about the lives of the subjects still in the house. I recall asking him regarding any people being in the burning house.
>
> Q. What, if anything, did the defendant say in response to your questions?
>
> MR. GRIMES: Objection.
>
> COURT: Overruled.
>
> A. He said, that is the subject, 'there's a woman in the home, she's been raped and stabbed, and the house is burning.'
>
> EXCEPTION:
>
> This constitutes
>
> DEFENDANT'S EXCEPTION No. 2."

We recognize that procedural safeguards effective to secure the privilege against self-incrimination are necessary whenever law enforcement officers question a person who has been "taken into custody or otherwise deprived of his liberty in any significant way." *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694. When custodial interrogation begins is a question which has generated much judicial discussion. *See* Annotation, 31 A.L.R. 3rd 565.

The holding in *Miranda* does not extend to normal investigative activities conducted prior to arrest, detention, or charge. *Miranda v. Arizona, supra; State v. Oxentine,* 270 N.C. 412, 154 S.E. 2d 529. Justice Bobbitt (later Chief Justice), writing for the Court in *State v. Meadows,* 272 N.C. 327, 158 S.E. 2d 638, aptly stated the rule distinguishing general police investigation from custodial interrogation:

> "A general investigation by police officers, when called to the scene of a shooting, automobile collision, or other occurrence calling for police investigation, including the questioning of those present, is a far cry from the 'in-custody interrogation' condemned in *Miranda.* Here, nothing occurred that could be considered an 'incommunicado interrogation of individuals in a police-dominated atmosphere.' . . ."

*Accord: State v. Sykes,* 285 N.C. 202, 203 S.E. 2d 849; *State v. Gladden,* 279 N.C. 566, 184 S.E. 2d 249; *State v. Shedd,* 274 N.C. 95, 161 S.E. 2d 477; *State v. Hayes,* 273 N.C. 712, 161 S.E. 2d 185.

A careful contextual reading of the testimony of Deputy Sheriff Hallisey discloses that when defendant made the statement to Hallisey, the Deputy was engaged in a general on-the-scene investigation which was obviously directed to whether there were persons in the burning dwelling. There was nothing to suggest an in-custody interrogation or that the investigation had been focused upon defendant as the perpetrator of a crime.

Further, Chief Goodman had already testified without objection to substantially the same facts. It is well established that when evidence is admitted over objection and the same evidence has theretofore or thereafter been admitted without objection, the benefit of the objection is lost. *State v. Jarrette, supra; State v. Perry,* 275 N.C. 565, 169 S.E. 2d 839; 1 D. Stansbury, North Carolina Evidence § 30 (Brandis Rev.).

State v. Pruitt

We find no merit in this assignment of error.

Defendant next contends that the trial judge erred in denying defendant's motion to suppress the oral and written confessions allegedly made by defendant.

When Lt. Smith testified that defendant was carried to the Sheriff's Department and warned of his constitutional rights by Sgt. Conerly, counsel for defendant requested a *voir dire* to determine the admissibility of any statements made by defendant in the form of a confession. Thereupon, the trial judge excused the jury, and Sgt. Conerly, in summary, testified as follows: After Pruitt was placed under arrest, he was carried to a seven-by-seven fluorescent lighted room at the rear of the Sheriff's Department for interrogation. This room was used because its location insured privacy. Lt. Smith, Sgt. Conerly, Officer Martin, and defendant were in the room during the interrogation. All of the officers participated in the questioning. Before questioning commenced, Sgt. Conerly read the following material from a plastic card:

> "Warning as to your rights. You are under arrest. Before we ask you any questions, you must understand what your rights are. You have the right to remain silent. You are not required to say anything to us at any time or to answer any questions. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we question you and have him with you during questioning. If you cannot afford a lawyer and want one, a lawyer will be provided for you. If you want to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering any time until you talk to a lawyer."

Defendant indicated that he understood his rights and did not indicate that he wanted a lawyer. He then gave defendant a "Voluntary Statement" form (Exhibit 44), which defendant read and signed. The form reads as follows:

"VOLUNTARY STATEMENT

DATE 9 Oct 73 PLACE Fayetteville, N. C.
TIME STARTED 5:20 P.M.

I, Frank Pruitt, II, am 21 years old. My date of birth is 28 Dec 51. I live at 5105 Patton St, Lot 103, Fayetteville, N. C.

The person to whom I give the following voluntary statement, Lt. C. D. Smith, Sgt. Bob Conerly, Sgt. Danny Martin, having identified and made himself known as a Deputy Sheriff, Cumberland County, N. C., DULY WARNED AND ADVISED ME, AND I KNOW:

1. That I have the right to remain silent and not make any statement at all, nor incriminate myself in any manner whatsoever.

2. That anything I say can and will be used against me in a court or courts of law for the offense or offenses concerning which this statement is herein made.

3. That I can hire a lawyer of my own choice to be present and advise me before and during this statement.

4. That if I am unable to hire a lawyer I can request and receive appointment of a lawyer by the proper authority, without cost or charge to me, to be present and advise me before and during this statement.

5. That I can refuse to answer any question or stop giving this statement any time I want to.

6. That no law enforcement officer can prompt me what to say in this statement nor write it out for me unless I choose for him to do so.

A. No one denied me any of my rights, threatened or mistreated me, either by word or act, to force me to make known the facts in this statement. No one gave, offered or promised me anything whatsoever to make known the facts in this statement, which I give voluntarily of my own free will and accord.

B. I do not want to talk to a lawyer before or during the time I give the following true facts, and I knowingly and purposely waive my right to the advice and presence of a lawyer before and during this statement.

C. I certify that no attempt was made by any law enforcement officer to prompt me what to say, nor was I refused any request that the statement be stopped, nor at anytime during this statement did I request for the presence or advice of a lawyer.

I have read each page of this statement consisting of 1 pages, each page of which bears my signature, and corrections, if any, bear my initials, and I certify that the facts contained herein are true and correct.

This statement was completed at 5:30 P.M. on the 9th day of October, 1973.

WITNESS: s/ CHARLES D. SMITH
WITNESS: s/ BOB CONERLY
      s/ FRANK PRUITT, II
      Signature of person giving voluntary statement"

Defendant then made an oral statement which was reduced to writing.

On cross-examination Sgt. Conerly stated that the interrogation began immediately after defendant signed Exhibit 44. He further testified:

"... We told him about the bloody fatigues, the money and the discrepancies in what he had said and we flat told him that he had done it. We told him that this was it, this was the time to get it off his chest. Besides telling him that it would be better for him to get it off his chest, we told him he would probably feel better. We told him in essence that we knew he had done it, there were too many holes in his story, that it was a terrible thing and that he would probably feel better to tell. Before making the statement and before answering our questions relative to what happened, he did indicate that he had told us all that he knew. That was before he said anything incriminatory.

\*    \*    \*

"We advised him that we knew he was lying and there were too many holes in his story and that we considered him the type of person that such a thing would prey heavily upon, that he would be relieved to get it off his chest, that he hadn't fooled us, that we knew he was lying, that we knew he had committed the crimes. *It was during the time prior to his confession that we told him it would be better for him to just go ahead and get it off his chest.*

"... I probably did tell him to quit playing games or words to that effect. ... I recall advising him that this was serious and that we were not playing games.

\*     \*     \*

". . . We indicated the discrepancies in his verbal and written statement, that we felt he was the guilty party and we didn't want to fool around. By fooling around we meant by his not making any further lying statements or untruths. . . . Each of us did say essentially that there were too many holes in his story, that we knew he had lied, that we knew he had killed them and set fire to their house and that we wanted to get to the bottom of it and get the truth. All three of us at one time or another prior to his confession did relate that to him.

"Pruitt answered questions all along. It was approximately 15 to 20 minutes before he confessed. . . . I believe he did state he would like to take a polygraph. . . . [H]e made several comments to me, one of which was to ask me if I thought he could get work release. *I possibly told him that he would be making it harder on himself by not making a statement.*

\*     \*     \*

". . . *Yes, I did tell Mr. Pruitt that it would simply be harder on him if he didn't go ahead and cooperate.*

\*     \*     \*

"Pruitt was in the room, that is room A, approximately 15 to 20 minutes before he incriminated himself. . . ." (Emphasis supplied.)

The written statement which defendant signed before Magistrate J. B. Darden, Jr., was in pertinent part as follows:

"I declare that the following voluntary statement is made to the aforesaid person of my own free will without promise of hope or reward, without fear or threat of physical harm, without coercion, favor or offer of favor, without leniency or offer of leniency, by any person or persons whatsoever.

This morning, about 4:00 A.M., I left my trailer and went to the residence of a friend of mine, Jerry Donlin, who lives next door. I knocked on the front door and his wife, Chris, answered the door. Jerry had already gone to work. Chris and I talked for a while. She accused me of something and said that she was going to tell my wife but wouldn't tell me what she was going to tell my wife about.

State v. Pruitt

I got mad and started choking her. We were in the living room. After I choked her for a while, I then went into the kitchen and went by the washing machine and got a rifle with a wooden stock. I struck her a few times on the head with the rifle. The wooden stock broke off of the rifle and I left it (the wooden stock) in the kitchen and laid the metal barrel under the couch. About this time her two children came into the living room crying. I tried to get them to stop crying but they wouldn't. I then took them into the front bedroom and talked to them but they still cried and they went into the back bedroom, the master bedroom. I followed them in there. I chocked them and thought they were dead. But they were not. I then choked them again and they seemed dead this time. I then found some matches and set two fires. One I set in the master bedroom closet and closed the door and the other one I started in the front bedroom. I also took around Fifty Dollars from Chris' purse. After setting the fires, I then went back to my trailer. End of Statement.

I have read this statement consisting of 1 page) s—, and I certify that the facts contained therein are true and correct. I further certify that I made no request for the advice or presence of a lawyer before or during any part of this statement, nor at any time before it was finished did I request that this statement be stopped. I also declare that I was not told or prompted what to say in this statement.

This statement was completed at 7:30 P.M. on the 9th day of October, 1973, Sworn before me this 10/9/73; Witness; J. B. Darden, Magistrate; Witness: Bob Conerly; Signature of Person giving voluntary statement, Frank Pruitt, II."

The Court found that the officers did not threaten defendant or offer him any inducement of any kind during the interrogation and that it appeared to Officer Conerly that defendant was normal in every respect during the interrogation. Upon these findings the Court concluded that defendant's statement was voluntarily and knowingly made without inducement and coercion and after defendant had been fully advised of his constitutional rights. The Court thereupon denied defendant's motion to suppress.

Defendant offered no evidence on *voir dire*.

The jury returned, and Sgt. Conerly testified before the jury to facts similar to those contained in defendant's confessions.

The trial judge properly excused the jury and heard evidence as to whether defendant's alleged oral and written confessions were voluntarily and understandingly made. *State v. Bishop,* 272 N.C. 283, 158 S.E. 2d 511; *State v. Gray,* 268 N.C. 69, 150 S.E. 2d 1, *cert. denied,* 386 U.S. 911, 87 S.Ct. 860; *State v. Barnes,* 264 N.C. 517, 142 S.E. 2d 344, *vacated and remanded on other grounds,* 375 U.S. 28, 84 S.Ct. 137, 11 L.Ed. 2d 45. Generally, facts found by the trial judge are conclusive on the appellate courts when supported by competent evidence. Nevertheless, the conclusions of law drawn from the facts found are not binding on the appellate court. *State v. Bishop, supra; State v. Walker,* 266 N.C. 269, 145 S.E. 2d 833; *State v. Hines,* 266 N.C. 1, 145 S.E. 2d 363. Thus, whether the conduct and language of these investigating officers amounted to such threats or promises as to render a subsequent confession involuntary is a question of law reviewable on appeal. *State v. Fox,* 274 N.C. 277, 163 S.E. 2d 492; *State v. Biggs,* 224 N.C. 23, 29 S.E. 2d 121.

As a result of the decision in *Miranda v. Arizona, supra,* a number of procedural safeguards must be employed prior to an in-custody interrogation, and unless the warnings and waivers demanded by *Miranda* are demonstrated by the prosecution, no evidence obtained by the interrogation is admissible.

[2] In instant case there was plenary evidence that the procedural safeguards required by the *Miranda* decision were recited by the officers and that defendant signed a waiver stating that he understood his constitutional rights, including his right to counsel. Even so, the ultimate test of the admissibility of a confession still remains whether the statement made by the accused was in fact voluntarily and understandingly made. *State v. Bishop, supra; State v. Gray, supra; State v. Conyers,* 267 N.C. 618, 148 S.E. 2d 569; *State v. Rogers,* 233 N.C. 390, 64 S.E. 2d 572. The fact that the technical procedural requirements of *Miranda* are demonstrated by the prosecution does not, however, standing alone, control the question of whether a confession was voluntarily and understandingly made. The answer to this question must be found from a consideration of the entire record. *Davis v. North Carolina,* 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed. 2d 895; *Blackburn v. Alabama,* 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed. 2d 242; *State v. McCloud,* 276 N.C. 518, 173 S.E. 2d 753.

[3] The facts of instant case direct our inquiry to the question of whether the circumstances reveal that the challenged confession was obtained by the influence of hope or fear implanted in defendant's mind by the acts and statements of the police officers during defendant's custodial interrogation. This Court has considered this question many times against varied factual backgrounds, and we think it profitable briefly to review some of these decisions.

In the landmark case of *State v. Roberts*, 12 N.C. 259, the prisoner, after he was arrested, was told that, since he was in custody, any confession he might make could not be given in evidence against him at trial; therefore, he might as well come out with the whole truth. Another person present stated that if the prisoner made confessions, it would be to his credit thereafter. On these urgings, made in the presence of the prosecutor, the defendant made the confession which was offered into evidence at his trial. Several days later, of his own motion, the defendant requested the jailer to send for the prosecutor and stated that he wished to disclose to him the names of certain persons who had been concerned and involved in the commission of the offense charged. During the course of this second conference with the prosecutor, the defendant made certain statements which tended to establish his own complicity in the crime.

Rejecting the confessions as involuntary, Chief Justice Taylor, writing for the Court, in part, stated:

". . . The true rule is that a confession cannot be received in evidence where the defendant has been influenced by any threat or promise; for, as it has been justly remarked, the mind, under the pressure of calamity, is prone to acknowledge, indiscriminately, a falsehood or a truth, as different agitations may prevail; and therefore a confession obtained by the slightest emotions of hope or fear ought to be rejected. . . ."

Justice Henderson, concurring, set forth the rule as to voluntariness of confessions, a rule which still retains its vitality almost a century and a half after its writing:

"Confessions are either voluntary or involuntary. They are called voluntary when made neither under the influence of hope or fear, but are attributable to that love of truth which predominates in the breast of every man, not operated upon by other motives more powerful with him, and

which, it is said, in the perfectly good man cannot be countervailed. These confessions are the highest evidences of truth, even in cases affecting life. But it is said, and said with truth, that confessions induced by hope or extorted by fear are, of all kinds of evidence, the least to be relied on, and are therefore entirely to be rejected. . . ."

In *State v. Whitfield*, 70 N.C. 356, the defendant was charged with larceny of a hog. The owner, a white man in company with two other white men, went into the field where the defendant, a Negro man in his employment, was working. He told the defendant that the hog had been stolen and said to him, "I believe you are guilty. If you are, you had better say so. If you are not, you had better say that." Thereupon, defendant confessed. Holding the confession to be involuntary, the Court employed the following language:

"It is contrary to the genius of our free institutions, that any admissions of a party should be heard as evidence against him unless made voluntarily. The common law looks with jealousy upon anything that has the semblance of torture, and declares that no confession of guilt shall be heard in evidence unless made voluntarily; for, if made under the influence of either hope or fear, there is no test of its truthfulness. . . . Such is the abhorrence of the common law in respect to extorting confessions, that it is a settled rule, no confession of one charged with crime shall be admitted in evidence against him when it appears that the confession was made by reason of hope or fear. . . . [W]e are satisfied, as a matter of legal inference, that the prisoner made the confession under the influence of hope or fear, or both feelings, excited by the conduct and language of the parties who had him in their power."

Another case factually similar to the case now before us is *State v. Stevenson*, 212 N.C. 648, 194 S.E. 81. There the evidence tended to show that the defendant had started to make a statement while in jail and was told by an officer that he need not lie because the officer already had more than enough evidence for his conviction. The defendant thereupon confessed. This Court awarded a new trial on the ground that the confession was not a free and voluntary confession but was instead a product of unlawful inducement on the part of the law enforcement officer.

In *State v. Drake,* 113 N.C. 625, 18 S.E. 166, the facts showed that while the defendant was being carried from the place of his arrest to a Justice of the Peace, a law enforcement officer said to him, "If you are guilty, I would advise you to make an honest confession. It might be easier for you. It is plain against you." At that time the defendant denied his guilt, but after the Justice of the Peace had committed him to jail, he confessed. The Court again held the confession to be involuntary and, in part, stated:

". . . The assertion of his innocence, in reply to the proposition that he should confess and thus make it easier for him, does not at all prove that the offer of benefit from the officer who had him in charge did not find a lodgment in his mind. If so, what could be more reasonable than that when he found himself on the way to prison in charge of the author of this hope that a confession would alleviate his condition, he should be tempted to act then upon a suggestion that he had rejected when the prospect did not seem to him so dark, and make a confession. It *may* have proceeded from this cause, from this hope so held out to him. If it *may* have proceeded from that cause, there is no guaranty of its truth, and it must be rejected. *S. v. Lawhorne,* 66 N.C., 638; *S. v. George,* 50 N.C., 233."

In *State v. Livingston,* 202 N.C. 809, 164 S.E. 337, the defendants were arrested, and after measuring their shoes and tracks at the scene of the crime, the officers told defendants that "it would be lighter on them to confess" and that "it looks like you had about as well tell it." The defendants forthwith confessed to the crime charged. There the Court, relying upon *State v. Roberts, supra,* held that the confessions were involuntary and inadmissible in evidence. *Accord: State v. Fox, supra* (Officer told defendant that it would be better for him in court if he told the truth and that he might be charged with a lesser offense of accessory to the homicide charge rather than its principal.) ; *State v. Fuqua,* 269 N.C. 223, 152 S.E. 2d 68 (A police officer told the incarcerated defendants that he [the officer] would be able to testify that they cooperated if they aided the State in its case.) ; *State v. Woodruff,* 259 N.C. 333, 130 S.E. 2d 641. (Officer obtained favors and concessions on the part of State officials to induce defendant to aid in solving the homicide and promised that if the evidence obtained involved defendant, he would try to help defendant.) ; *State v. Davis,* 125 N.C.

612, 34 S.E. 198 (Officer told defendant that he had "worked up the case and he had as well tell all about it.").

The rule set forth in *Roberts* has been consistently followed by this Court. The Court has, however, made it clear that custodial admonitions to an accused by police officers to tell the truth, standing alone, do not render a confession inadmissible. *State v. Thomas*, 241 N.C. 337, 85 S.E. 2d 300; *State v. Thompson*, 227 N.C. 19, 40 S.E. 2d 620; *State v. Thompson*, 224 N.C. 661, 32 S.E. 2d 24. Furthermore, this Court has made it equally clear that any improper inducement generating hope must promise relief from the criminal charge to which the confession relates, not to any merely collateral advantage. *State v. Hardee*, 83 N.C. 619; *see State v. Pressley*, 266 N.C. 663, 147 S.E. 2d 33.

In instant case the interrogation of defendant by three police officers took place in a police-dominated atmosphere. Against this background the officers repeatedly told defendant that they knew that he had committed the crime and that his story had too many holes in it; that he was "lying" and that they did not want to "fool around." Under these circumstances one can infer that the language used by the officers tended to provoke fright. This language was then tempered by statements that the officers considered defendant the type of person "that such a thing would prey heavily upon" and that he would be "relieved to get it off his chest." This somewhat flattering language was capped by the statement that "it would simply be harder on him if he didn't go ahead and cooperate." Certainly the latter statement would imply a suggestion of hope that things would be better for defendant if he would cooperate, *i.e.*, confess.

We are satisfied that both the oral and written confessions obtained from defendant were made under the influence of fear or hope, or both, growing out of the language and acts of those who held him in custody. We hold that both the oral and the written confessions obtained in the Sheriff's Department on 9 October 1973 were involuntary and that it was prejudicial error to admit them into evidence.

The facts of this case disclose the commission of brutal and revolting crimes. Yet, we must apply well-recognized rules of law impartially to easy and hard cases alike lest me make bad

law which will erode constitutional safeguards jealously guarded by this Court for nearly a century and a half.

We would not be understood to hold that our ruling on the admissibility of the oral and written confessions obtained by police officers on 9 October 1973 is intended necessarily to vitiate the apparently volunteered statements made to Deputy Sheriff Ray Starling on 10 October 1973. At the next trial the admissibility of these statements should be determined by the trial judge after a *voir dire* hearing. *See State v. Godwin,* 216 N.C. 49, 3 S.E. 2d 347; *State v. Lowry,* 170 N.C. 730, 87 S.E. 62; 2 D. Stansbury, North Carolina Evidence § 185 (Brandis Rev.).

We do not deem it necessary to consider at length defendant's assignment of error concerning the argument of the district attorney. Suffice it to say that arguments which refer to the failure of defendant to testify are disapproved. *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed. 2d 106, *rehearing denied,* 381 U.S. 957, 85 S.Ct. 1797, 14 L.Ed. 2d 730; *State v. Roberts,* 243 N.C. 619, 91 S.E. 2d 589; *see* Annotation, 24 A.L.R. 3d 1093.

Neither do we see prejudicial error in the admission of defendant's negative answer to S.B.I. Agent Windham's question, "What's the matter Frank, are you sick about what you did?" We simply note in passing that this question and answer could have added little to the State's case.

For the reasons stated, there must be a

New trial.