STATE OF NORTH CAROLINA v. HERMAN K. SIMPSON

No. 60

(Filed 1 February 1980)

1. **Criminal Law § 75.1— defendant not taken before issuing magistrate—Pennsylvania requirement—suppression of confession in N.C. not required**

The fact that Philadelphia officers failed to take defendant before a proper issuing official in Philadelphia for issuance of a warrant and for preliminary arraignment in accordance with the Pennsylvania Rules of Criminal Procedure was not grounds for suppression of defendant's inculpatory statement in a trial in N.C.

2. **Criminal Law § 75.9— questioning by officers—defendant's statement voluntary**

Defendant's inculpatory statement was voluntarily and understandingly made where defendant voluntarily went to the police station to discuss the investigation with police officers; he was advised of his constitutional rights and indicated that he did not desire the presence of a lawyer; defendant was accorded every courtesy and every request; there were no threats and no inducement generating hope of relief of any kind; and the fact that an officer told defendant, before he made the inculpatory statements, that the officer thought defendant was a liar and thought that he was guilty, standing alone, did not render the confession inadmissible.

3. **Criminal Law § 34— admission of another crime in confession—incompetency on question of guilt**

In a prosecution for first degree murder, first degree burglary and assault with a firearm with intent to kill, the trial court erred in admitting evidence that defendant had committed sodomy with a dog, since evidence of the independent, unrelated crime was inadmissible to prove defendant's guilt of the crimes charged, even though that evidence was contained in defendant's confession to the crimes charged.

4. **Burglary and Unlawful Breakings § 4; Criminal Law § 38— custom or habit—evidence admissible to establish essential element of crime**

In a prosecution for first degree murder of a rest home resident, first degree burglary and assault with a firearm with intent to kill, the trial court did not err in admitting testimony of the rest home assistant supervisor that it was her custom to keep the windows and screens of the rest home closed, since such evidence was relevant upon the question of how entry to the rest home was gained, and there was no merit to defendant's contention that evidence of habit or custom should not be allowed for the purpose of establishing an essential element of a crime.

5. **Burglary and Unlawful Breakings § 5— first degree burglary—breaking through window—sufficiency of evidence**

Evidence of first degree burglary was sufficient to be submitted to the jury, though defendant contended that he entered a rest home, the crime

scene, through an open window, where the evidence tended to show that the investigating officer found the window in question open, the screen on the ground outside, and a sawhorse under the window; it would be unreasonable to believe that, even if someone inside the rest home had opened the window, he would have also removed the screen and thrown it out on the ground; removal of the screen would constitute a breaking; and it was the custom of the assistant supervisor to keep the windows and screens closed.

APPEAL by defendant from *Brewer, Judge.* Judgments entered 25 January 1979 in Superior Court, CUMBERLAND County.

Defendant was charged in indictments, proper in form, with (1) the first degree murder of Nellie Hair on 29 March 1976, (2) (a) first degree burglary, and (2) (b) assault with a firearm with intent to kill. The jury found defendant guilty of the felony of first degree murder, the felony of first degree burglary, and the misdemeanor of assault with a deadly weapon. The trial judge properly ruled that the burglary conviction merged with the murder conviction, and sentenced defendant to life imprisonment (this offense was committed prior to the reenactment of the death penalty in North Carolina). Defendant was sentenced to a prison term of two years on the misdemeanor conviction, to commence at the expiration of the life sentence. On 13 August 1979 this Court allowed defendant's motion to bypass the Court of Appeals on the misdemeanor conviction.

The State's evidence tended to show the following.

During the early morning hours of March 29, 1976, an attendant at the Person Street Rest Home in Fayetteville, Cumberland County, North Carolina, noticed that the light was on in the room of Ms. Nellie Hair. She opened the door to the room and saw that Ms. Hair was on her bed with her gown pulled up to her waist. A man was in the room next to the bed, zipping up his trousers. After the attendant screamed the man ran out the back door of the rest home. The man who was in the room was a black male about five feet seven or eight inches tall and heavy built. He had a mustache and was wearing a brown cap and brown coat. [According to the record of defendant's interview with the Philadelphia police officers defendant is a Negro male, five feet eight and one-half inches tall, weighing 192 pounds, and wearing a mustache.] The police arrived and discovered Ms. Hair's bathroom window open and screenless, with a sawhorse under the bathroom

window and the window screen nearby. Ms. Hair died as a result of injuries to her head which she received that night. She had been hit hard in the head with a blunt instrument. No one could identify the man who had been in the room.

On 12 April 1976 officers of the Philadelphia, Pa. Police Department, at the request of the Fayetteville, N.C. Police Department, interviewed defendant concerning the homicide in the death of William A. Kinlaw in Fayetteville, N.C. on 21 March 1976 (*see State v. Simpson*, 297 N.C. 399, 255 S.E. 2d 147 (1979)). During this interview defendant not only confessed to the murder of William A. Kinlaw on 21 March 1976, he also confessed to the murder of Nellie Hair on 29 March 1976. Defendant stated to the officers:

"I left Linda's [Linda Ann Bethea, defendant's girlfriend who lives in Fayetteville, N.C.] house sometime after midnight and I walked to the rest home on Person Street [the Person Street Rest Home] which is acrossed from the A & P. I got in the rest home through an opened bathroom window on the side near the back of the home. There is a two-story house on that side of the rest home. Once I got inside I walked down the hallway to a room where an old white lady was asleep in bed. I got up close to her and she woke up and yelled and I hit her with a rock or a brick I had taken in with me from outside the rest home. The room wasn't well lighted but I think I hit her in the head. I pulled the bed covers back and I was opening my pants when a middled aged lady came in and cut the lights on. She saw me and ran from the room and I fired a shot at her with the .32 I had from the old man [Mr. Kinlaw].

The gun had went off without me even knowing it. I ran from the rest home and went through the back door and threw the brick or rock hard away from me. I ran beside the side of the rest home near the creek. I went back to Linda's house. I brought the gun back with me to Philadelphia when I came back. I kept it for a while and then I threw it away in a garbage can in Philadelphia."

When the police were called to the Person Street Rest Home during the morning of the Nellie Hair homicide the attendant who had found a man in the Nellie Hair room told the officers that the

man had fired a shot at her and had run out the back door. A .32 cal. bullet was recovered from a wall in the rest home.

The defendant offered no evidence before the jury.

Other evidence necessary to an understanding of the errors assigned will be discussed in the opinion which follows.

*Attorney General Edmisten, by Special Deputy Attorney General Lester V. Chalmers, Jr., for the State.*

*Malcolm R. Hunter and Fred J. Williams, Assistant Public Defenders, Cumberland County, for the defendant.*

BROCK, Justice.

Defendant brings forward seven assignments of error which he presents in eight arguments, the first assignment of error being asserted on two legal theories. They are: (1) that the trial court erred in failing to suppress the evidence of defendant's inculpatory statement given to the Philadelphia law enforcement officers because (a) the officers failed to take defendant before a proper issuing authority in Pennsylvania for issuance of a warrant and for preliminary arraignment as is required by the Pennsylvania Rules of Criminal Procedure, and (b) because defendant's inculpatory statement was involuntary; (2) that the trial court erred in the admission of evidence of defendant's having committed sodomy with a dog; (3) that the trial court erred in the admission of testimony of the rest home attendant that it was her custom to keep the windows and screens closed; (4) that the trial court erred in refusing to dismiss the first degree murder charge; (5) that the trial court erred in refusing to dismiss the first degree burglary charge; (6) that the trial court erred in refusing to dismiss the assault with a deadly weapon with intent to kill charge; and (7) that the trial court erred in instructing the jury that the evidence tended to show that the defendant entered the building by a breaking. We will discuss the assignments of error in the order presented.

### 1(a).

[1] Should defendant's inculpatory statement have been suppressed because the Philadelphia officers failed to take defendant before a proper issuing official in Philadelphia for issuance of a

warrant, and for preliminary arraignment in accordance with the Pennsylvania Rules of Criminal Procedure? We hold that this is not grounds for suppression of the inculpatory statement in a trial in North Carolina.

This same argument was advanced in the first *Simpson* case (*State v. Simpson*, 297 N.C. 399, 255 S.E. 2d 147 (1979)) and we felt it did not merit discussion. However, with the hope that this argument will not again be asserted we give it a brief treatment. The Pennsylvania Rules of Criminal Procedure are not applicable to trials in North Carolina. Motions to suppress evidence in trials in North Carolina are governed by North Carolina law.

### 1(b).

[2] Should defendant's inculpatory statement have been suppressed because it was not voluntary? We hold that defendant's inculpatory statement was voluntarily given and, excepting the parts hereinafter held to be inadmissible, was properly admitted into evidence at trial.

Prior to trial defendant moved to suppress the evidence of defendant's inculpatory statements given to the Philadelphia police officers. Defendant argues that the statements were coerced and therefore not voluntary. On 10 and 11 January 1979 Judge Canaday, in accordance with proper procedure, conducted a full evidentiary hearing on defendant's motion to suppress. Judge Canaday made detailed findings of fact, to which no exceptions are taken, finding that all of defendant's statements were freely, voluntarily, understandingly and intentionally made, and that no threat of physical or mental violence of any nature or promise or assurance of help or reward of any nature was made to defendant by said law enforcement officers as an inducement to the defendant to make statements and furnish information to them. Judge Canaday thereafter ordered that defendant's motion to suppress be denied.

With defendant having excepted only to the order denying his motion to suppress we are presented only with the question of whether the findings of fact by Judge Canaday support his order denying defendant's motion to suppress. Judge Canaday's findings of fact are as follows:

"That on April 9, 1976, the Fayetteville Police Department was investigating the death of Willie Alexander Kinlaw, the death having occurred on March 21, 1976 and the death of Nellie Hair having occurred on March 29, 1976. That a crucial part of that investigation pertained to a telephone call made from the residence of Willie Alexander Kinlaw on the morning of March 21, 1976 to Philadelphia, Pennsylvania. That on April 9, 1976, Detectives Donald Lyons and George Smith of the Philadelphia Police Department, at the request of the Fayetteville Police Department, went to the residence of Millie Smith at 210 West Abbottsford in Philadelphia, Pennsylvania. That while there the detectives met Millie Smith, her daughter, Mary Melton and Herman Simpson with whom they had a conversation concerning the phone call. During that conversation, Simpson advised the officers that while he had made telephone calls from Fayetteville to Philadelphia, he had not made such a call on March 21, 1976.

That on April 12, 1976, Detective Daniel Rosenstein and Detective Konieczny located Herman Simpson and Mary Melton in the Wyneva Hotel in Philadelphia, Pennsylvania. The Detectives advised Simpson that they would like to talk with him concerning the aforesaid matters; that Simpson agreed to come down with the officers to the Police Administration Building, but needed a short time to get dressed. At approximately ten (10) minutes later, Simpson and Ms. Melton left the hotel room and came downtown to the Police Administration Building along with Ms. Melton's mother, Millie Smith. That Herman Simpson arrived at the Police Administration Building at approximately 9:15 o'clock a.m.

That Herman Simpson, Mary Melton and Millie Smith were all escorted into room number 104 of the Police Administration Building which was the homicide section of that department. That once inside, Herman Simpson went into an interview room located within room number 104 in the Police Administration Building and was left alone in that room from 9:17 o'clock a.m. until 9:30 o'clock a.m. That at 9:30 o'clock a.m., Simpson was advised of his constitutional rights by Detectives Rosenstein and Konieczny and at that time, Simpson acknowledged to the officers that he understood his rights; that he had a right to keep quiet; that anything he

said would be used against him; that he did not desire to remain silent; that he had a right to talk to a lawyer and that if he could not afford a lawyer, one would be appointed for him free of charge, and at that time, Simpson stated he did not want to talk to a lawyer and was willing to answer questions. That at approximately 9:40 o'clock a.m., Simpson was taken to the bathroom and given water and that he returned to the interview room at approximately 9:46 o'clock a.m. where he remained alone until 9:50 o'clock a.m. That at 9:50 o'clock a.m., Simpson was again advised of his constitutional rights by Detective Cook of the Fayetteville Police Department, Agent Van Parker of the North Carolina State Bureau of Investigation and Detective Rosenstein of the Philadelphia Police Department and again Simpson acknowledged that he understood his rights and that he did not desire the presence of an attorney and that he was willing to talk to the officers.

That after this second advisement of rights and waiver of rights by Simpson, he again was offered a drink and a meal by Detective Rosenstein at approximately 10:10 o'clock a.m. which Simpson refused.

That Detectives Cook and Rosenstein and Agent Parker interviewed Simpson from approximately 10:11 o'clock a.m. until 11:25 o'clock a.m. at which time Simpson was given a break, water and taken to the bathroom. That the interview was interrupted for this break from 11:25 o'clock a.m. until 11:55 o'clock a.m. That at 11:55 o'clock a.m., the interview resumed and continued until 1:25 o'clock p.m. at which time Simpson again was offered a meal and he refused. The interview resumed at approximately 1:26 o'clock p.m. and continued until 2:45 o'clock p.m. at which time the interview was stopped for the purpose of having the information which Simpson had related to the officers reduced to a typewritten form. That at approximately 2:46 o'clock p.m., Simpson was taken to a cafeteria by Detective Cook and returned to room number 104 at approximately 3:10 o'clock p.m. That Simpson was left alone in the interview room from 3:10 o'clock p.m. for a short time after which Detective (sic) Lyons, Rosenstein and Cook entered the interview room and obtained Simpson's permission to search his apartment in the hotel. That Simpson consented to the search of this premises at approximate-

ly 3:15 o'clock p.m. at which he was given a meal of a ham and cheese sandwich, a coke and a cake. Simpson spent from 3:15 o'clock p.m. until 3:35 o'clock p.m. consuming said meal. That between 3:35 o'clock p.m. and 5:00 o'clock p.m. the Detectives received portions of the typed statement as it was being prepared by secretaries outside the interview room and would go over each page as it was received with Simpson during this time. That at 5:00 o'clock p.m., Detectives Cook, Rosenstein and Agent Parker went over the typed statement with Simpson and he signed it at approximately 5:15 o'clock p.m.

That the oral interview resumed with Cook, Parker and Rosenstein from 5:15 o'clock p.m. until 6:15 o'clock p.m. At 6:15 o'clock p.m., Simpson was given water and taken to the bathroom and the interview resumed at 6:25 o'clock p.m. with Agent Parker and Simpson. Parker's interview with Simpson lasted until 7:25 o'clock p.m. at which time Simpson was again given water. At 7:30 o'clock p.m. the interview resumed with Detective Rosenstein and continued until 8:30 o'clock p.m. At approximately 8:30 o'clock p.m., Detective Dupe entered the interview room and advised Simpson that he had a warrant issued from the State of North Carolina for the arrest of Simpson in connection with the death of Willie Alexander Kinlaw on March 21, 1976. That the said North Carolina warrant was not served or read to Simpson, but he was advised at that time by Detective Dupe of the existence of the warrant and what it charged. At approximately 8:37 o'clock p.m., Detective Dupe left the interview room and Simpson made a statement to Detective Rosenstein that he had committed the crimes in question and that if he could see Millie Smith, he would tell the Detectives about it. That at approximately 8:40 o'clock p.m., Millie Smith entered the interview room and remained alone with Simpson until 8:50 o'clock p.m. at which time she asked to leave and was allowed to leave the interview room. That at 8:50 o'clock p.m. Detective Rosenstein re-entered the room and continued the interview with Simpson until 9:20 o'clock p.m. at which time Simpson requested to be able to visit with Mary Melton.

At approximately 9:20 o'clock p.m. upon Simpson's request Mary Melton was allowed to enter the interview room

State v. Simpson

and remained alone with Simpson until 9:25 o'clock p.m. at which time she left upon her own request. At 9:25 o'clock p.m. the oral interview resumed with Detective Rosenstein and continued until 9:30 o'clock p.m. At 9:30 o'clock p.m. Agent Parker entered the room and joined Rosenstein and Simpson during which time Simpson related in detail the circumstances involving the death of William Alexander Kinlaw on March 21, 1976 and Nellie Hair on March 29, 1976. At 10:45 o'clock p.m., Simpson was taken to the bathroom and given water and returned to the interview room at 10:55 o'clock p.m.

Simpson remained alone in the interview room from 10:55 o'clock p.m. until approximately 11:10 o'clock p.m. at which time Agent Parker and Detective Rosenstein re-entered the room with a typewriter for the purpose of reducing the admission by Simpson to a typewritten fashion. That from approximately 11:10 o'clock p.m. until 11:55 o'clock p.m. Agent Parker and Detective Rosenstein reduced the admissions by Simpson which had been made from approximately 8:30 o'clock p.m. that evening to typewritten fashion in Simpson's presence. The typewritten statement was read to Simpson from 11:55 o'clock p.m. and concluded at 12:05 o'clock a.m. April 13, 1976. At 12:05 o'clock a.m., Simpson was asked by Agent Parker to sign the typewritten statement of admissions which he refused to do at 12:06 o'clock a.m. At 12:06 o'clock a.m., Parker asked Simpson if the statement in its typewritten fashion was correct to which Simpson replied yes. At 12:07 o'clock p.m. Simpson was offered a meal again and was given a cheeseburger and milk which he consumed and was left alone from 12:30 o'clock a.m. until 1:25 o'clock a.m. At 1:25 o'clock a.m., Simpson was slated by telephone in the Fourteenth District of the Philadelphia Judicial System.

At 1:30 o'clock a.m. a request was made to the Philadelphia Public Defender's Office for an attorney to advise Simpson on the question of extradition and Simpson remained in the interview room alone until 2:40 o'clock a.m. at which time a Public Defender arrived and conferred with Simpson until 3:46 o'clock a.m. at which time the attorney advised the Detectives that Simpson did not wish to waive extradition.

The Courts (sic) specifically finds as a fact that at the time Herman K. Simpson voluntarily agreed to accompany Detectives Rosenstein and Konieczny from the Wyneva Hotel to the Police Administration Building in Philadelphia, Pennsylvania on April 12, 1976, he did so freely and voluntarily and was not under arrest at that time; further that the Defendant was advised by Agent Parker, Detectives Cook and Rosenstein at approximately 9:50 o'clock a.m. on April 12, 1976 that he was being questioned concerning the homicide deaths of Willie Alexander Kinlaw on March 21, 1976 and Nellie Hair on March 29, 1976 in Fayetteville, North Carolina; that at no time during the interview process was Herman Simpson placed under arrest and at no time was Simpson handcuffed to any chair or in any fashion. The Court finds that Simpson was subjected to the same security procedures within the Police Administration Building as any other individual and was not placed under arrest or confinement during said interview process; further that Herman Simpson intelligently, intentionally and voluntarily waived his right to counsel and agreed to talk to Detectives on April 12, 1976 concerning the deaths of the aforementioned individuals; further that Simpson never requested to be allowed to leave the Police Administration Building nor to have the presence of counsel at any part of the interview process nor to stop answering questions nor to have the presence of an attorney at any time.

Further that any and all statements made by Herman Simpson to Detectives Rosenstein and Cook and Agent Parker were freely, voluntarily, understandingly and intentionally made and that no threat of physical or mental violence of any nature or promise or assurance of help or reward of any nature was made to the Defendant by said law enforcement officers as an inducement to the Defendant to make statements and furnish information to them.

That further the Court finds that the Defendant was not restrained of his liberties by law enforcement officers until a warrant was served upon him, but that he probably would not have been permitted to leave the Police Administration Building after Fayetteville Police Officer Dupe entered the

room with the warrant for Defendant's arrest which had been issued previously by the North Carolina Courts."

Defendant argues that the foregoing facts found by Judge Canaday require suppression of defendant's inculpatory statements under the principles laid down in *State v. Pruitt*, 286 N.C. 442, 212 S.E. 2d 92 (1975). We disagree.

In holding the inculpatory statement inadmissible in *Pruitt*, Justice Branch (now Chief Justice) stated:

"The rule set forth in *Roberts* has been consistently followed by this Court. The Court has, however, made it clear that custodial admonitions to an accused by police officers to tell the truth, standing alone, do not render a confession inadmissible. (Citations omitted.) Furthermore, this Court has made it equally clear that any improper inducement generating hope must promise relief from the criminal charge to which the confession relates, not to any merely collateral advantage. (Citations omitted.)

In instant case the interrogation of defendant by three police officers took place in a police-dominated atmosphere. Against this background the officers repeatedly told defendant that they knew that he had committed the crime and that his story had too many holes in it; that he was 'lying' and that they did not want to 'fool around.' Under these circumstances one can infer that the language used by the officers tended to provoke fright. This language was then tempered by statements that the officers considered defendant the type of person 'that such a thing would prey heavily upon' and that he would be 'relieved to get it off his chest.' This somewhat flattering language was capped by the statement that 'it would simply be harder on him if he didn't go ahead and cooperate.' Certainly the latter statement would imply a suggestion of hope that things would be better for defendant if he would cooperate, *i.e.*, confess." 286 N.C. at 458, 212 S.E. 2d at 102.

In the case *sub judice* there is no threat of any kind and there is no inducement generating hope of relief of any kind. It is true that the officer told defendant, before defendant made the inculpatory statements, that the officer thought defendant was a

liar and thought that he was guilty, but this standing alone does not render the confession inadmissible. *See State v. Thomas*, 241 N.C. 337, 85 S.E. 2d 300 (1954); *State v. Thompson*, 227 N.C. 19, 40 S.E. 2d 620 (1946); *State v. Thompson*, 224 N.C. 661, 32 S.E. 2d 24 (1944). Defendant's reliance on *Pruitt* is misplaced.

Nor does the principle of *Dunaway v. New York*, --- U.S. ---, 99 S.Ct. ---, 60 L.Ed. 2d 824 (1979) require that defendant's inculpatory statements be suppressed. In the case *sub judice* there was no "seizure" of defendant until after he confessed. Defendant voluntarily went to the police station to discuss the investigation with the Philadelphia officers. The defendant was accorded every courtesy and every request.

Defendant's first assignment of error is overruled.

2.

[3] Defendant argues that the trial court committed error in the admission of evidence that defendant committed sodomy with a dog. This evidence was contained in defendant's inculpatory statement and in quite substantial additional testimony offered by the State. For the reasons stated in *State v. Simpson*, 297 N.C. 399, 405-08, 255 S.E. 2d 147, 152-53 (1979) we agree with defendant and order a new trial on these charges. It is appropriate to point out that the present trial was held in January 1979 and the opinion in the other *Simpson* case was filed 12 June 1979, therefore the trial judge, the district attorney, and defense counsel could not have been aware of our holding in that case at the time this case was tried.

3.

[4] Defendant argues that the trial court committed error in admitting testimony of the rest home assistant supervisor that it was her custom to keep the windows and screens of the rest home closed. Defendant concedes that "[evidence of] a person's habit or custom or practice of doing a certain thing in a certain way is admissible as evidence that he did the same thing in the same way on a particular occasion which is in issue in the case." 1 Stansbury's North Carolina Evidence Brandis Rev. § 95 (1973). However, defendant argues that evidence of habit or custom should not be allowed for the purpose of establishing an essential element of a crime. We see no merit in such a distinction.

In this prosecution one of the offenses charged against defendant was the felony of common law burglary. A breaking is an essential element of the common law crime of burglary. *State v. Madden*, 212 N.C. 56, 58, 192 S.E. 859, 860 (1937). In this case the window screen was found lying nearby the window and the window was found raised with a sawhorse standing beneath the window. A removal of the screen or a raising of the window would constitute a breaking within the meaning of the law. *State v. Wells*, 290 N.C. 485, 226 S.E. 2d 325 (1976). The testimony of the assistant supervisor of the rest home that it was her custom to keep the screens and windows of the rest home closed was clearly relevant upon the question of how entry to the rest home was gained. Also the testimony of the assistant supervisor's custom of keeping the screens and windows closed was competent as evidence that on the occasion in question the assistant supervisor followed her custom on the night in question and that the window and screen were closed. It was for the jury to determine from the evidence whether it was satisfied beyond a reasonable doubt that the window and screen, or either one, were closed on the night in question. Upon this question of allowing evidence of habit or custom or practice as evidence to establish an essential element of a crime our Court of Appeals affirmed the allowance of such evidence in *State v. Lash*, 21 N.C. App. 365, 204 S.E. 2d 563, *cert. denied*, 285 N.C. 593 (1974). In *Lash* the defendant was indicted on charges of felonious larceny and felonious receiving of stolen goods. The jury found her not guilty of felonious larceny and guilty of felonious receiving. An essential element of the State's case against the defendant for felonious receiving was that the defendant was in possession of stolen goods. In holding evidence of the customary inventory procedures of Belk's and Laurie's stores admissible to show that the goods in the defendant's possession were stolen the Court of Appeals stated:

"There was no error in permitting employees of the Belk's and Laurie's stores to testify that when a garment is sold in their stores a part of the tag is removed for the purpose of inventory control to record the sale of the particular garment by color, size, style and manufacturer, and to testify that the tags on the garments found in defendant's car were intact, which indicated the garments had not been sold. These were facts within the knowledge of the witnesses, and

State v. Simpson

their testimony did not invade the province of the jury, which still had the task of determining whether the garments had been stolen." 21 N.C. App. at 368, 204 S.E. 2d at 566.

This assignment of error is overruled.

## 4.

Defendant argues that the trial court erred in refusing to dismiss the charge of first degree murder at the close of the State's evidence. The first degree murder conviction was based upon the "felony murder" rule of the homicide having been committed in the perpetration of a felony (in this case burglary). Defendant concedes that it would be proper to submit the issue of first degree murder to the jury if it was proper to submit the issue of first degree burglary. The propriety of submitting the issue of first degree burglary to the jury is the subject of defendant's next assignment of error. We will therefore discuss the assignments jointly under defendant's assignment of error No. 5.

## 5.

[5] Defendant argues that the trial court erred in refusing to dismiss the charge of first degree burglary at the close of the State's evidence. By his appraisal of the evidence defendant argues that the State's evidence failed to show a breaking into the rest home. He argues that the State's evidence is susceptible *only* to a conclusion that entry was gained through a window which was already open. We disagree with such an appraisal.

Defendant points to the State's evidence by way of defendant's inculpatory statement which was offered by the State (*see* summary of facts preceding this opinion). Therein the defendant told the Philadelphia officers: "I got in the rest home through an opened bathroom window on the side near the back of the home." This statement, defendant argues, is evidence that defendant entered through a window which was already open. We disagree with the defendant's contention that this statement clearly indicates that he entered through a previously opened window. Obviously defendant could not have gained entry through a window (unless it was glassless) unless it was open. However his statement is silent as to whether he did or did not open the window.

Even if the window were already open, a removal of the screen would constitute a breaking under the law. *State v. Wells, supra.* It is unreasonable to believe that even if someone inside the rest home had opened the window that they would also have removed the screen and thrown it out on the ground.

Added to defendant's inculpatory statement is the State's evidence in explanation and clarification. The State's evidence showed that the investigating officer found the window open, the screen on the ground outside, and a sawhorse under the window. The State's evidence further showed that it was the custom of the assistant supervisor to keep the windows and screens closed as evidence that the window and screen were closed at the time in question. Defendant argues that this evidence of custom of the assistant supervisor has no probative value because the assistant supervisor was not on duty during the early morning hours of March 29, 1976, the time of the alleged offense, and could not have known whether her custom was followed at that time. Apparently defendant misreads the evidence. Mrs. Lillian Campbell, the assistant supervisor, testified, *inter alia*, as follows: "I worked there [the rest home] for ten years and was working on the early morning hours of March 29, 1976, which was a Sunday."

Although we disagree with defendant's argument it is interesting to note that defendant argues he is entitled to dismissal of the burglary charge (for failure to show a breaking) and entitled to a new trial upon a charge of felonious breaking or entering. A conviction of felonious breaking or entering (which does not require a breaking but only an entering) would nevertheless constitute the felony required to bring the homicide within the felony murder rule. Therefore such a conviction would avail defendant nothing since a felonious entry conviction would support (as did the burglary conviction) a conviction of first degree murder under the felony murder rule. A felonious entry conviction would merge (as did the burglary conviction) with the first degree murder conviction and the life imprisonment sentence would be the same.

We hold that the evidence, considered in the light most favorable to the State, justified submission of the first degree burglary charge to the jury, and in turn justified submission of the first degree murder charge to the jury.

Assignments of error Nos. 4 and 5 are overruled.

6.

Defendant abandons assignment of error No. 6.

7.

Defendant argues that the trial court erred in instructing the jury that the evidence tended to show that defendant gained entry to the rest home by climbing on a sawhorse, opening a window, and removing a screen. From a reading of the evidence and from the discussion of the evidence in this opinion it is clear that the evidence tended to show exactly what the trial judge instructed the jury that it tended to show. This assignment of error is overruled.

The defendant argues no assignment of error specifically addressing any alleged error in his conviction of assault with a deadly weapon, but the evidence of defendant having committed sodomy with a dog so prejudicially permeated the entire proceeding that justice requires a new trial on the misdemeanor charge also. Obviously defendant cannot again be placed on trial for assault with a deadly weapon with intent to kill (a felony) in the light of his acquittal of that charge by the verdict of the jury finding him guilty of an assault with a deadly weapon (a misdemeanor).

For the error in the admission of evidence of defendant having committed sodomy with a dog there must be, for each of the three charges, a

New trial.