STATE OF NORTH CAROLINA
v.
SHANE MASON SEEK.
No. COA06-1650
Court of Appeals of North Carolina.
Filed November 20, 2007
This case not for publication
Attorney General Roy Cooper, by Assistant Attorney General Jane Rankin Thompson, for the State.
Mark Montgomery for Defendant.
STEPHENS, Judge.

I. FACTS and PROCEDURE
On 29 June 2006, Shane Mason Seek ("Defendant") was convicted of two counts of first-degree rape and three counts of taking indecent liberties with a child. He was sentenced to two consecutive 264 to 326 month prison terms for the two rape convictions and two of the indecent liberties convictions, with an additional 19 to 23 months for the remaining indecent liberties conviction. On appeal, Defendant assigns error to (1) the trial court's denial of his motion to suppress, (2) the trial court's limitation of his cross-examination of N.V., and (3) the trial court's refusal to allow Defendant to examine certain documents regarding the prosecuting witness. For the reasons stated below, we overrule Defendant's assignments of error.
At trial, the evidence tended to show the following: N.V., the prosecuting witness, was thirteen years old at the time of the trial and was living with her grandmother, mother, and nine brothers and sisters. Her mother had become friends with Defendant's wife at church, and N.V. had become friends with Defendant's children. Defendant first began touching N.V. inappropriately when N.V.'s mother and father were away picking up her oldest brother from church camp. Defendant rubbed her shoulders and asked if he could look down her shirt. A few weeks later, when he was visiting her home, Defendant went upstairs while N.V. was in the bathroom and asked if he could kiss her breasts. She was afraid she would be hurt or get in trouble so she let him touch her. She wrote about the first incident in her diary. An entry from 25 June 2004 described the first time Defendant touched her and how he told her she would look sexy in her bra and panties.
Thereafter, sexual activity between N.V. and Defendant took place about twice a month, ending in October or November 2004. Defendant usually kissed her breasts, rubbed her shoulders, and stuck his "private" into her while she was sitting on his lap and his pants and underwear were down. Defendant also kissed and licked her "private."
N.V. did not initially tell her mother about the activity, but she did show her diary to two friends. Later she talked to her friends' mother about the incidents and then to the police. She was subsequently examined by a doctor. N.V. wrote a statement for the police, which was admitted to corroborate her testimony, and circled areas on a diagram of a girl indicating where Defendant had touched her.
M.V. is N.V.'s sixteen-year-old brother. On one occasion, he saw N.V. come out of the upstairs bathroom with Defendant. On a second occasion, when he could not find N.V. or Defendant, he knocked on the locked bathroom door and then climbed out onto the roof and looked into the bathroom window. He saw N.V. completely naked. Defendant was kissing her breasts. M.V. knocked on the window and told Defendant that he knew what Defendant was doing. Defendant wanted to know what his "proposal was." M.V. did not do anything at that point. Shortly thereafter, Defendant was arrested.
Detective Gregory Mills ("Detective Mills") was a child abuse investigator assigned to the case on 25 October 2004. He and a social worker interviewed N.V. on 28 October 2004. At the beginning of the interview, N.V. handed them a letter she had written. She told them Defendant touched her breasts, kissed her breasts and vagina, and put his "private" into her. She said these acts occurred in the bathroom of her house and at Defendant's residence approximately eight or nine times, at least once a month. Detective Mills also interviewed M.V. on 28 October 2004 and learned that M.V. had seen Defendant kissing N.V.'s breasts. Detective Mills subsequently telephoned Defendant and requested that he come in for an interview. On 4 November 2004, Defendant voluntarily came to the Cumberland County Law Enforcement Center for an interview with Detective Mills. When asked about his relationship with N.V., Defendant said he mostly tried to avoid her because he did not want to be caught in compromising positions with her. He initially denied ever having sex with her, but stated that one time when he gave her a neck massage, she asked to have sex with him. Defendant also stated that on another occasion, she had trapped him in the upstairs restroom and bared her breasts, and he brushed against them trying to leave. By the end of the interview, however, Defendant admitted to kissing N.V.'s breasts, rubbing his penis against her vagina, and having sexual intercourse with her one time.
Michael Hohan was a detective in the juvenile unit of the Cumberland County Sheriff's Department when Detective Mills asked for his assistance in taping an interview. On 4 November 2004, he operated the video equipment during Defendant's interviews with Detective Mills and an investigator from the Department of Social Services, Jeannie Dwyer. After hearing the interviews, Detective Hohan made the supervisory decision to take Defendant into custody. Part of the transcribed interview was admitted into evidence, and portions of the videotape were shown to the jury.
Dr. Sharon Cooper, a forensic pediatrician, examined N.V. on 15 November 2004. Dr. Cooper's examination revealed a healed tissue tear in N.V.'s vaginal floor at the 3 o'clock and 6 o'clock positions, indicating penetration through the hymenal ring to the floor of the vagina. In Dr. Cooper's opinion, N.V. had a history of behavioral and physical findings that were consistent with sexual and emotional abuse and penetration by a penis.

II. MOTION TO SUPPRESS
Defendant assigns error to the trial court's denial of his motion to suppress the inculpatory statement he made to Detective Mills at the Cumberland County Law Enforcement Center. For the following reasons, we hold the trial court properly denied Defendant's motion to suppress.

A. MIRANDA WARNINGS
Defendant first argues that he made the inculpatory statement while he was "in custody" for purposes of Miranda v. Arizona, 384 U.S. 436, 16 L. Ed. 2d 694 (1966), that no Miranda warnings were given, and thus, the statement should have been suppressed. After careful review, we find that Defendant was not "in custody" for purposes of Miranda and that Miranda warnings were, therefore, not required.
The applicable standard for reviewing a trial court's determination on a motion to suppress is that "[a] trial court's findings of fact . . . are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting."State v. Eason, 336 N.C. 730, 745, 445 S.E.2d 917, 926 (1994), cert. denied, 513 U.S. 1096, 130 L. Ed. 2d 661 (1995). Conclusions of law reached by the trial court in determining whether a defendant was in custody must be legally correct, reflecting a correct application of applicable legal principles to the facts found.State v. Fernandez, 346 N.C. 1, 484 S.E.2d 350 (1997).
The proper inquiry for determining whether a person is "in custody" for purposes of Miranda is "based on the totality of the circumstances, whether there was a `formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" State v. Buchanan, 353 N.C. 332, 339, 543 S.E.2d 823, 828 (2001) ("Buchanan I") (citations omitted). Further, "[t]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323, 128 L. Ed. 2d 293, 298 (1994). Accordingly, in this case, we must examine, based upon the trial court's findings of fact, "whether a reasonable person in defendant's position . . . would have believed that he was under arrest or was restrained in his movement to the degree associated with a formal arrest." Buchanan I, 353 N.C. at 339-40, 543 S.E.2d at 828.
A voir dire hearing on Defendant's motion to suppress was held on 26 June 2006. Thereafter, the trial court entered an order setting forth the following pertinent findings of fact:
5. That after an initial investigation, the defendant was contacted by phone by Detective Mills and asked to come to the Sheriff's Department for an interview.
6. That as a result of making an appointment to see Detective Mills, the Defendant drove to the Law Enforcement Center. In that L.E.C. was a secured facility, Detective Mills met the defendant and escorted him to an interview room. That the interview room consisted of a room approximately 10 feet by 10 feet and contained a table and chairs.
7. That a conversation took place with the defendant and Detective Mills for approximately one hour during which conversation the defendant incriminated himself.
8. That at no time during the interview in question was the Defendant informed that he was in custody, under arrest, nor was the Defendant ever placed in handcuffs or placed in a locked room or cell. That the defendant was told that he could leave at any time.
9. That after the interview, the defendant was asked by Detective Mills if he would wait a few minutes to talk with a social services worker to which the defendant agreed. The defendant was left in the interview room alone while waiting for the social services worker to arrive.
10. That after being interviewed by the social services worker, the defendant was placed under arrest and incarcerated.
First, Defendant argues there is no competent evidence to support the trial court's finding of fact that "at no time during the interview was Defendant placed in a locked room or cell." Upon review of the record, we find no evidence pertaining to whether or not the interview room was locked. Thus, we agree with Defendant that this finding of fact is not supported by the evidence.
Next, Defendant argues there is no competent evidence to support the trial court's finding of fact that "the defendant was told he could leave at any time." The record reveals the following testimony given by Detective Mills on direct examination:
Q. Was  did you, at any time, communicate to the defendant that he was not in custody or was free to leave?
A. I indicated to him, later in the interview, that he would be able to leave.
. . . .
Q. Did you, at any time, indicate to Mr. Seek that he would be free to leave?
A. Yes, ma'am.
Q. Okay; and, when was that?
A. Toward the end of the interview, I made the  a statement that  I don't remember the exact words, but I made mention that he would be able to leave after the interview.
This evidence does not support the finding that Defendant was told he could leave "at any time." The evidence instead shows that toward the end of the interview, Defendant was told he would be able to leave after the interview. Thus, we agree with Defendant that this finding of fact was not supported by the evidence. Accordingly, since these findings of fact are not supported by competent evidence, they cannot be used to support a conclusion of law that Defendant was not "in custody." See, e.g., Cavenaugh v. Cavenaugh, 317 N.C. 652, 658, 347 S.E.2d 19, 23 (1986) ("Since the trial judge's findings of fact are not supported by competent evidence, they cannot be used to support a conclusion of law that the plaintiff does not have an adequate remedy at law[.]"). Thus, we exclude these unsupported findings of fact from our analysis.
Based on a thorough review of the record, we conclude that the trial court's remaining findings of fact are fully supported by competent evidence. Given these findings, we agree with the trial court that at the time of the incriminating statement made by the Defendant, a reasonable person would believe that he was free to leave at any time and that the incriminating interviews were non-custodial interviews. In addition, in view of the surrounding circumstances a reasonable person in the Defendant's position would not have believed that he was under arrest and the circumstances surrounding this incident were not the functional equivalent of arrest.
Defendant argues, however, that he reasonably believed he was not at liberty to terminate the interrogation and leave because (1) he was interrogated in a secured area of the Cumberland County Sheriff's Department, (2) he was escorted everywhere in the building, and (3) he was told he could leave after the interview. Upon reviewing the totality of circumstances surrounding Defendant's interview, we are not persuaded that these three factors rendered Defendant "in custody."
First, the mere fact that Defendant was questioned in the Law Enforcement Center does not lead to a conclusion that Defendant was "in custody." As the United States Supreme Court has stated:
Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.
Oregon v. Mathiason, 429 U.S. 492, 495, 50 L. Ed. 2d 714, 719 (1977).
Next, in State v. Buchanan, 355 N.C. 264, 559 S.E.2d 785 (2002) ("Buchanan II") (per curiam), our Supreme Court upheld the trial court's ruling suppressing incriminating statements made by the defendant only where special security measures were implemented for the defendant.[1]Id. Upon arrival at the police station, the defendant in Buchanan was allowed to use the restroom and to get a drink of water by himself. Buchanan I, 353 N.C. 332, 543 S.E.2d 823. During a subsequent interview, the defendant admitted to participating in a homicide, stating that he "'just went berserk,' that he went behind the bar where the shotgun rack was and that he took a gun off the wall and started shooting at [the victims]." Id. at 334, 543 S.E.2d at 825. Shortly after making such admission, the defendant again asked to use the restroom. This time, however, he was accompanied to the restroom by the two police interrogators, one of whom was in uniform and carried a firearm. After returning from the bathroom, the defendant made a second incriminating statement. Subsequently, the defendant was arrested, charged, and given Miranda warnings. The trial court concluded that "a reasonable person in defendant's position would have believed he was in custody . . . when, after admitting to his station house interrogators that he had participated in a homicide, those same interrogators accompanied him to the bathroom, with an officer staying with defendant at all times." Buchanan II, 355 N.C. at 265, 559 S.E.2d at 785. Consequently, the trial court suppressed any statements the defendant made between the time he returned from being accompanied to the bathroom until Miranda warnings were properly administered, and the Supreme Court affirmed. Buchanan II, 355 N.C. 264, 559 S.E.2d 785.
Unlike the security for the defendant in Buchanan, in this case no security measures were implemented solely for Defendant, nor was there ever an abrupt elevation in security surrounding Defendant. Because the Sheriff's office is a secure building that "requires pass cards to get onto the elevator and different areas[,]" Detective Mills met Defendant when he arrived at the Law Enforcement Center and escorted Defendant to an interview room. Furthermore, Detective Mills escorted Defendant to the water fountain, the only time Defendant left the interview room, because, as Detective Mills explained to Defendant, the Sheriff's office is a secure area and "[w]e don't let visitors wander the hallway[.]" From the time of his voluntary arrival at the Law Enforcement Center to the time of his actual arrest, Defendant was treated just as any other visitor to the Law Enforcement Center would have been treated  a fact that was made clear to him  giving him no reason to believe he was under arrest nor restrained in his movement to that degree.
Finally, in State v. Garcia, 358 N.C. 382, 597 S.E.2d 724 (2004), the Supreme Court affirmed the trial court's denial of the defendant's motion to suppress his inculpatory statement, holding the defendant was not in custody at the time he made his statement. The Court determined that
Defendant is an adult male who has prior experience with the criminal justice system in this state. He was transported to the police station at his own request. While waiting for transportation, defendant was generally alone. Although defendant was frisked before entering any police vehicle, officers explained the reason for the pat-downs and carried them out with defendant's consent. During this process, Officer Council twice informed defendant that he was not under arrest.
The trial court noted that defendant's conversation was polite, lighthearted, and casual while en route to the police station. Upon arrival, he was free to move about unescorted to get a drink of water from the fountain. Thereafter, defendant was asked to wait in an unlocked interview room. A plain-clothed, unarmed officer conducted defendant's interview. At no time did either party raise his voice. Defendant was not threatened in any way, and no promises were made to him. He was not handcuffed at any time preceding, during, or immediately following the interview. Each of defendant's requests was granted, and in fact, Detective Andrews took a break during the interview to fulfill them.
Id. at 397, 597 S.E.2d at 737. Given these circumstances, the Supreme Court agreed with the trial court that at the time the defendant made the contested statement, he was not under arrest, nor was his movement restrained to the degree associated with a formal arrest. Garcia, 358 N.C. 382, 597 S.E.2d 724
The defendant in Garcia argued that a reasonable person subjected to three pat-downs, a closed interview room door, and the interviewing detective's statement that another party had "given him up" would believe himself to be under arrest or restrained in movement to that degree. The defendant also pointed out that he would not have been able to leave the police car in which he had voluntarily ridden to the police station because the rear doors of police vehicles lock automatically. However, the Court, in reviewing the totality of the circumstances, determined that "the four factors defendant identifie[d] did not render him in custody as defined by Miranda." Id. at 397, 597 S.E.2d at 737.
The circumstances in Garcia are similar to those in the case sub judice. Here, Defendant is an adult male with prior experience in the criminal justice system of North Carolina as a sex offender. Defendant voluntarily agreed to be interviewed by Detective Mills and drove himself to the Sheriff's office to be interviewed. At no time before or during the interview was Defendant told he was in custody or under arrest, nor was he ever placed in handcuffs. The tone of the interview was subdued with no raised voices, and initially the two men discussed their military services and other miscellaneous subjects. Defendant made no requests during the interview and never asked to leave. Toward the end of the interview, Defendant was asked if he wanted some water. Even though he was escorted to the water fountain, Detective Mills explained to Defendant that he was being escorted to the fountain because it was a secure area, and to show him where it was. Detective Mills then asked Defendant if he would wait until a social worker arrived to speak with him, and Defendant agreed. Defendant was left alone and unrestrained while Detective Mills went to get the social worker. Although, unlike Defendant in this case, the defendant in Garcia was informed by the interrogating officer that he was not under arrest, such statements are circumstances to be weighed when considering the totality of the circumstances, and are not conclusive as to whether or not a defendant was "in custody." See Buchanan II, 355 N.C. 264, 559 S.E.2d 785 (holding the defendant was "in custody" even though he was told several times that he was not under arrest and that he was free to leave at any time).
Accordingly, "we reiterate that custody analysis, for purposes of Miranda, is dependent upon the unique facts surrounding each incriminating statement. This Court reviews those facts and circumstances together as a whole because the effect on a reasonable person is best discerned from context; no one factor is determinative." Garcia, 358 N.C. at 399, 597 S.E.2d at 738. Based upon the totality of the circumstances here, we hold that a reasonable person in Defendant's position would not have believed that he was under arrest or that his freedom of movement was restrained to the degree of a formal arrest. We conclude that the trial court's findings of fact which are supported by competent record evidence in turn support its conclusion of law that Defendant was not "in custody" when he made the contested statement. Therefore, the police were not required to give Miranda warnings.

B. INVOLUNTARY STATEMENT
Defendant next asserts the trial court erred in denying his motion to suppress because the trial court's findings of fact did not support the conclusion that Defendant's constitutional rights were not violated. Defendant contends his statement to police was made involuntarily and that the admission of an involuntary statement is constitutional error under the Fifth and Fourteenth Amendments of the United States Constitution and Article I, §§ 19 and 23 of the North Carolina Constitution. Following careful review, we find that Defendant's statement was made voluntarily and, therefore, was properly admitted.
A statement is only admissible if it "was given voluntarily and understandingly." State v. Schneider, 306 N.C. 351, 355, 293 S.E.2d 157, 160 (1982). The Court must examine the totality of the circumstances to determine whether a statement was voluntary. State v. Jackson, 308 N.C. 549, 304 S.E.2d 134 (1983). Factors to be considered are
whether defendant was in custody, whether he was deceived, whether his Miranda rights were honored, whether he was held incommunicado, the length of the interrogation, whether there were physical threats or shows of violence, whether promises were made to obtain the confession, the familiarity of the declarant with the criminal justice system, and the mental condition of the declarant.
State v. Hardy, 339 N.C. 207, 222, 451 S.E.2d 600, 608 (1994).
Applying the above factors to this case, we agree with the trial court's conclusion of law that Defendant's statement was voluntary. Although we need not recite again the evidence discussed above, we note that additional evidence from the record supports the trial court's conclusion. First, Detective Mills's interview with Defendant lasted only one hour, and social worker Jeannie Dwyer's interview lasted only thirty minutes. Furthermore, the record is devoid of any suggestion of physical threats or shows of violence to obtain Defendant's statement.
Defendant argues that, in addition to being in custody and not being given his Miranda warnings, he was induced to confess by threats and promises. However, "admonitions to an accused by police officers to tell the truth, standing alone, do not render a confession inadmissible." State v. Pruitt, 286 N.C. 442, 458, 212 S.E.2d 92, 102 (1975). Furthermore, "any improper inducement generating hope must promise relief from the criminal charge to which the confession relates, not to any merely collateral advantage." Id.
The following exchange took place during Detective Mills's interview of Defendant:
Mills:  like I  I deal with the facts that's all I deal with.
Defendant: I understand that 
Mills:  and I don't want  I don't want to have to go to the DA and say he's lying. And right now I believe you are.
. . . .
Mills:  to what point are you  what  what can you tell me that's truthful? What can I take over to the DA's office and be able to say Mr. DA he's telling me the truth about this and I believe him and we need to help him out?
Defendant claims Detective Mills's statements amounted to an "implied promise" that if Defendant did not confess, the detective would not help him. However, government agents may validly initiate conversations regarding a defendant's cooperation with the government or promise to make a defendant's cooperation known to the prosecutor without rendering a resulting confession involuntary. United States v. Shears, 762 F.2d 397 (4th Cir. 1985).
In State v. Barden, 356 N.C. 316, 572 S.E.2d 108 (2002), police officers told the defendant that they believed he was not telling the truth when he denied his involvement in the crime at issue and told him this was his opportunity to be truthful; made references to the defendant's having been in the Army; and said to the defendant that being in the Army was a respectable position so he should be respectable and truthful in making his statement. The Court did not find such statements by the officers to be improper and the defendant's confession was ultimately found to be voluntarily and understandingly given. Id. As in Barden, Detective Mills's statements were not improper promises or threats but rather legitimate attempts to convince Defendant to tell the truth. As such, Detective Mills's statements did not render Defendant's resulting confession involuntary.
Defendant also claims the social worker's statement that Defendant could not see his children until and unless he talked with the Department of Social Services at the police station was an improper threat. However, this statement was not related to Defendant's relief from the rape and indecent liberties charges against him, but referred to the purely "collateral advantage" of seeing his children, which was entirely disconnected from the possible punishment or treatment Defendant might receive.Pruitt, 286 N.C. at 458, 212 S.E.2d at 102. Consequently, the social worker's statement was not a threat which unfairly induced Defendant's statement.
Therefore, we hold that, based upon the totality of the circumstances, Defendant gave his statement voluntarily. In light of this holding, we also conclude that the trial court did not err in denying Defendant's motion to suppress.

III. RELEVANT EVIDENCE
Defendant next contends the trial court erred in refusing to allow any evidence relating to N.V.'s sexual abuse by her father to be admitted at trial. "A trial court's ruling on an evidentiary point will be presumed to be correct unless the complaining party can demonstrate that the particular ruling was in fact incorrect." State v. Herring, 322 N.C. 733, 749, 370 S.E.2d 363, 373 (1988). Even if the complaining party can show that the trial court erred in its ruling, relief ordinarily will not be granted absent a showing of prejudice. N.C. Gen. Stat. § 15A-1443(a) (2005). Relevant evidence is evidence having any tendency to make a fact at issue more or less likely. N.C. Gen. Stat. § 8C-1, Rule 401 (2005). Relevant evidence is generally admissible while evidence that is not relevant is not admissible. N.C. Gen. Stat. § 8C-1, Rule 402 (2005).
Defendant was on trial for rape and indecent liberties with a minor. Medical evidence presented by Dr. Cooper showed tears in N.V.'s vaginal tissue that had not healed back together. These findings indicated that penetration had occurred. Dr. Cooper concluded, based on the physical examination, that N.V.'s injuries could have been caused by a penis. DSS records indicated that N.V.'s father had been inappropriately touching her for about seven years, but had never had intercourse with her. Thus, evidence of abuse of N.V. by her father was not relevant to explain the physical evidence or to show that the rapes charged was not committed by Defendant. Accordingly, on the rape charges against Defendant, the evidence was properly excluded under Rule 402.
Dr. Cooper also concluded, based on speaking with and examining N.V., that N.V. had a history of behavioral and physical findings consistent with children who were sexually abused. Although Dr. Cooper did not testify at trial as to the exact behaviors on which she based her opinion, she did testify that N.V.'s symptoms were consistent with abuse. Even though evidence of abuse of N.V. by her father may have been an alternative explanation for N.V.'s behaviors, such evidence did not make it any less likely that Defendant committed indecent liberties with her. See State v. Holden, 106 N.C. App. 244, 416 S.E.2d 415 (1992) (holding any evidence that someone else may have abused the minor child in 1986 was irrelevant to show that the defendant did not abuse the child in 1989). Consequently, the evidence of N.V.'s abuse by her father was also properly excluded under Rule 402 on the indecent liberties charges against Defendant. Furthermore, even if such evidence was admissible for purposes of Defendant's indecent liberties charges, any error in excluding it was harmless beyond a reasonable doubt given N.V.'s testimony, the eyewitness testimony of her brother, the physical findings of Dr. Cooper, and Defendant's confession. Since no different result would have been reached by the jury had the evidence been allowed, any error was not reversible error and Defendant is not entitled to a new trial. N.C. Gen. Stat. § 15A-1443(b) (2005).

IV. EXCULPATORY INFORMATION
As a final matter, Defendant asks this Court to review the trial court's decision regarding records of N.V.'s case kept by the Cumberland County Department of Social Services. The trial court reviewed these records in camera and concluded that Defendant was entitled to have some of the documents included in the file. The trial court found the remaining records contained no exculpatory information to which Defendant was entitled. See Pennsylvania v. Ritchie, 480 U.S. 39, 94 L. Ed. 2d 40 (1987) (stating that the State's interest in maintaining the confidentiality of its files and the defendant's right to access to information necessary to the preparation of his defense are properly balanced by an in camera review of the records by the trial court and the trial court's obligation to release information material to the fairness of the trial). These remaining records were sealed by order of the trial court and transmitted to this Court for review on appeal.
After careful review of these records, we agree with the trial court that all of the records relevant to the case were made available to Defendant, and that the remaining records contain no information material to his defense. For the reasons stated, we hold that Defendant received a fair trial, free of error.
NO ERROR.
Judges McGEE and SMITH concur.
Report per Rule 30(e).
NOTES
[1] In Buchanan I the Court remanded the case, instructing the trial court to make additional findings of fact and to draw new conclusions of law considering only those circumstances surrounding the defendant's interrogation which "would contribute to an objective determination that [the] defendant's freedom of movement was restrained to the degree associated with a formal arrest." Buchanan I, 353 N.C. at 342, 543 S.E.2d at 830. On remand, the trial court added two findings of fact to its previous findings and under the proper test reassessed the circumstances surrounding the defendant's interrogation. Buchanan II, 355 N.C. 264, 559 S.E.2d 785. The Court affirmed the trial court's new conclusions of law on appeal. Id.