McGEE, Chief Judge.
 

 *640
 
 Anita Rychlik ("Anita") and her husband, David Rychlik ("David"), were employees of the Thrift Motel in Charlotte ("the motel") when Anita was shot and killed in the early morning hours of 2 May 2007. David was outside in the parking lot in front of the motel talking to Brandy Davis ("Brandy"), when three men ("the men"), all dressed in black, approached from the left side of the motel as one faced the front of the building. At that time, Anita managed the motel and David acted as the security guard. Anita was asleep inside the motel. One of the men was holding a gun, and the man forcibly searched David and Brandy, taking some personal items from both of them, and a set of keys to the motel from David.
 

 Brandy testified the men were African-American, that two of them were approximately five feet, six inches tall or five feet, seven inches tall and weighed about 150 pounds, while the third man was approximately six feet or six feet, one inch tall and weighed between 180 and 200 pounds. According to Brandy, the larger man was holding a small black gun. The men asked David where the safe was and they demanded keys. All three of the men were talking and demanding things. David was hit in the head with the gun during the altercation. Brandy described the man holding the gun as "the older gentleman," and "the tall one," and testified that he told one of the "younger guys" to stay with her and David, and to "shoot" them if they moved. Brandy could see the younger men's faces, and estimated them to be eighteen or nineteen years old. Brandy also testified that the man holding the gun had a "mask all the way down his face" which made it difficult to tell how old he was. One of the smaller, younger men remained with David and Brandy, while the other two men entered the motel. Brandy did not know if the younger man who remained with them had a gun. The two men then entered Anita's bedroom in the motel and there was a struggle. Brandy heard Anita give "a very panic-attack scream," and Anita was shot once in the back of her neck and killed. The men then fled from the scene.
 

 *641
 
 James Rhymes ("Rhymes"), who lived at the motel, testified that on the night in question he left his room upon hearing a strange noise. As Rhymes turned to head toward Anita's office, which was a very short distance from Rhymes' room, he was confronted by a man wearing a mask and holding a gun. Rhymes pushed the gun away from him and turned and ran away up a nearby hill. As he was running away, he heard two gunshots, but was not hit.
 

 The three men escaped, and no one was charged with Anita's murder until 24 October 2011. However, during the course of the investigation Bobby Johnson ("Defendant") was identified as a suspect and, in 2007, he was placed in custody, read his
 
 Miranda
 
 rights, which he waived, and he voluntarily gave investigators an interview and a buccal swab for the purposes of collecting his DNA. DNA was also recovered from under Anita's fingernails, and these DNA samples were sent for testing and comparison. Results from the DNA analysis were returned to investigators in 2009. Although the DNA analysis indicated that only one in 16,600,000 African-Americans could have been the contributor of the DNA recovered from under Anita's fingernails, and that Defendant was one of those African-Americans who could have contributed that DNA, the Charlotte-Mecklenburg Police Department did not attempt to locate Defendant until late 2011.
 

 A police detective "called [Defendant] and spoke to him a number of times and made arrangements for him to come down to the station." Detective William Earl Ward, Jr. ("Detective Ward") testified that they "wanted to talk to him about the DNA evidence." Defendant voluntarily went to the police station
 
 *628
 
 on the morning of 24 October 2011, arriving at approximately 9:40 a.m. Defendant was escorted to an interview room on the second floor, just outside the homicide office. The interview room was behind doors that remain locked. Detective Ward and Detective Brian Whitworth ("Detective Whitworth"), together ("the detectives") began to interview Defendant. Approximately four hours after entering the interview room, Defendant was placed under arrest for murder, and approximately ten minutes later, after additional conversation, he was read his
 
 Miranda
 
 rights and signed a waiver of those rights. Approximately twenty-five minutes after that, Defendant began to discuss his involvement in the crime. Defendant named brothers Antonio Chaney ("Tony") and Joshua Chaney ("Josh") as the two other men involved, and stated that it was Tony who shot and killed Anita.
 

 Because the voluntariness of Defendant's confession is an issue on appeal, we examine in great detail Defendant's interrogation on 24 October 2011-from the initiation of the questioning until Defendant
 
 *642
 
 admitted participating in Anita's murder. According to the video recording of Defendant's interview, the questioning began in a police interrogation room at approximately 9:50 a.m. Defendant told the detectives that he had been "saved" recently, and Defendant was reminded that Detective Ward had interviewed him back in 2007. At approximately 10:11 a.m., the detectives showed Defendant a forensic report stating DNA had been recovered from under Anita's fingernails,
 
 [1]
 
 and that there was only a one in 16,600,000 chance that the DNA would match any particular African-American, but that the DNA recovered from under Anita's fingernails matched Defendant's DNA.
 

 Detective Ward told Defendant that the 2007 interview had locked Defendant into a statement and that, with the DNA report, they now had the "meat and potatoes," and that Defendant's 2007 statement was coming back and "kicking you in the ass." Defendant was told that the crime was committed by three people, and that one of those three people was Defendant. Defendant was told: "The fact is your DNA is under [Anita's] fingernails in her living quarters which you denied even being there." Defendant was told that he needed "to do the right thing by God," and was told the DNA analysis "puts you there[,]" that "[y]ou were there that night, you know what happened." Defendant was told he had not been at home like he had been telling the detectives. Defendant was told, "you were there [at the motel], you were involved in this crime, it's as simple as that, I can't put it more plainly, you can't make this stuff up. It's a scientific fact." "You were there. This puts you there. You understand what this holds? This could be a capital murder case. This is a death penalty case." "If you want to wear it on your own, that's your decision. If you want to do the right thing and bring other people that were involved, that's your decision." The detectives continued:
 

 Your body parts, your cells, your DNA, are on her body. How can that happen if you never touched her? There's no way. There's no way your DNA can be spit in the wind and land somewhere. It has to be her grabbing your hair or grabbing your neck. That's how it happens. It's forever, Bobby.
 
 [2]
 
 Bobby, so you understand, where we're coming
 
 *643
 
 from is not "hey, we wanted to talk to you about this murder case...." Where we stand now as a law enforcement agency ... is that there's no question anymore. That's the meat and potatoes right there for the case [pointing at the DNA analysis]. That's enough to charge you with murder right now. Right now. My suggestion to you is this. Stop with the "I wasn't there," because this proves you were there.
 

 The detectives told Defendant that if the shooting was an accident, if Anita backed into the gun and "pow, holy sh*t, you didn't mean for that to happen, now's the time to talk about it. If you stay silent about it,
 
 *629
 
 Bobby, you're going to wear it." The detectives told Defendant that they knew what happened to Anita in her room, but that Defendant was going to have to explain it. Defendant was then told again that that the odds were one in 16,600,000 that any African-American person other than Defendant could have contributed the DNA recovered from under Anita's fingernails.
 

 Referring to an earlier comment Defendant had made, Detective Ward stated: "When you said [Anita] was shot in the back of the neck, only you, me, the victim, and the coroner knew that. That was not publicized." Detective Ward told Defendant: "I have locked you in so hard to this story here, you can't get out with a blow torch." As Defendant continued to deny being involved, the detectives stopped him from talking and told him they knew he was lying. The detectives told Defendant:
 

 You're in a box right now. This is the ... lock to the door [Detective Ward was holding the DNA report in his hand]. If you want to wear capital murder on your own and let them other two dipsticks go run free, that's on you man. I can't help you with that. But if you want to be a hero, be a real man, be a God saved man, then do the right thing.
 

 The detectives told Defendant they could not promise him anything and people had to pay for their crimes, but that Defendant was facing a capital murder charge and he needed to do what was best for himself. They told Defendant the district attorney would look at the people involved and work with those that they and the detectives believed were being "honest and true." Defendant was told he should cooperate and get the truth "off his chest." Defendant was told that "[p]eople need ... something to grab ahold of in a case when they're ... boxed in, and you're boxed in. You're boxed in by the best evidence that is out there for any case today-DNA." Defendant was told that because of the DNA
 

 *644
 
 evidence, "I know you're either my shooter, or you're someone who was with my shooter. We want the shooter."
 

 Defendant was asked, in light of the DNA evidence, what he thought the jury was going to think. Defendant answered that they would think he took part in the crime. Defendant was told that DNA analysts do not make mistakes, and he needed to "do the right thing." Defendant was told that the DNA evidence was "pretty damning, that puts you there." Defendant responded "That put me there, man. That right there just took my life. That right there just took my life." Detective Ward responded:
 

 Yes, so, and I want you to understand that. That's what I'm trying to explain to you, that it's over. This game is over. This is the meat and potatoes of the case [touching the DNA analysis], that's what we need to lock folks up. We thought well, we can go get a warrant, let's not do that.... But this isn't going away, this is a done deal. It's a done deal.
 

 Defendant responded: "I mean, I'm going to jail, so...." Detective Ward interjected: "Well, we're not there yet, but it's pretty close, ok? And if that will make you understand. If that will make you a believer that's, that's a possibility. We'll do what we need to do." Defendant replied, "I want to be on your team. I don't want to be in prison the rest of my damn life." Detective Ward said: "I tell you that the DA works with people...." Defendant interjected that the issue was "not going away," and told the detectives he would try and help them out in the hope that the case against him would be resolved in the best way possible. The detectives told Defendant: "We're going to need everybody that was involved, and what part they played, to help you. That's the only thing that's gonna help you. Saying what you're saying right now, that's not gonna help Bobby a damn bit."
 

 Shortly after making this statement, at approximately 10:36 a.m., the detectives asked Defendant if they could pat him down for weapons. Defendant complied, and was frisked and asked to take off his hat. After the pat-down, Defendant sat back in his chair and the interrogation continued. Defendant was asked to talk about his experience of being "saved," and was told that it was more important to help others than to help himself. The detectives told Defendant that there were three people involved, and that he was one of them. They told Defendant he should
 
 *630
 
 help himself, that if he wanted to "wear this" by himself, then "God bless you," but that that would be crazy since there were two others involved. Detective Ward said: "Sh*t, I wouldn't go down by myself."
 
 *645
 
 Defendant was then asked again if he had shot Anita, or been with the person who had, and Defendant again replied, "no." Defendant was told that the detectives did not believe him, and Defendant replied: "I know you don't." Defendant was told: "So what you're telling us, and what you're telling the DA, is that you're not willing to help out." Defendant was again reminded that it was a capital murder case with DNA evidence implicating him. Detective Ward told Defendant they locked him into a story in 2007, a story that was a lie, then they took the buccal swab to test his DNA, and that if "Bobby doesn't choose to help himself, then Bobby can wear it himself. All I can do is say that the smartest thing, based on my experience, is to cooperate.... You and two other folks, two other people, have gotten away with murder since 2007. That sucks."
 

 Detective Ward told Defendant they had shown the "meat and potatoes" to him, but he was still not willing to help himself. Defendant was told: "We rely on facts. We don't rely on B.S. This right here [touching DNA report] is fact." Defendant was then told: "Bobby doesn't know what we've done. He doesn't know that we haven't already talked to the
 
 other defendants
 
 . You don't know what other evidence we have, or what other folks have said about what you did." (Emphasis added).
 

 Defendant was told: "We've done our homework. The ball's in your court. The time to get on the bus and get the best seat is now. I didn't have this [the DNA evidence]" in 2007. The detectives told Defendant that he was allowed to tell his lies in 2007, but now they were showing him the truth. "It's black and white." The detectives offered to go and get an assistant district attorney to see what offer Defendant might get for cooperating, but Defendant declined. Defendant was told that it was up to him to "save your own tail," and that if he needed to throw others "under the bus" he should do that. The detectives talked some more about Defendant needing to get the best seat on the bus, and Defendant told them that he was trying to. Defendant then started crying.
 

 The detectives said that "accidents happen," and that Defendant should act in a godly way. Defendant said that he felt "set up." When Defendant again denied having been at the murder scene, the detectives told him he could not keep denying involvement. Defendant said: "I don't have a life." The detectives responded: "You don't," and told Defendant he was lying, they knew the truth, that Defendant could not deny what was in his heart, and that the only way to "take care of those tears" was to get it all out in the open and "clean his heart, clean Bobby's soul."
 

 *646
 
 The detectives then told Defendant his tears didn't "mean sh*t," that Defendant was just crying because he was "trapped," and that Defendant did what he did and made his own choices. The detectives told Defendant they were giving him the option to cut his losses, and that was all they could do. A few minutes later, Defendant stated: "I want to help you bad" and started to cry again. Defendant then hit himself in the head and began sobbing for over a minute. As Defendant whimpered with his head on the table, he was told to wipe his face, and asked if he had any regrets. Defendant was asked if the tears were for Anita or himself.
 

 At approximately 11:09 a.m., Defendant told the detectives he was sick to his stomach, and he was provided with a trash can and told that the only way to feel better would be to start talking to them. Defendant was told that the best thing for him, and what the jury would like to see, would be to show remorse. Defendant began sobbing again and denied having killed Anita. Defendant continued sobbing for a couple of minutes and, at one point, his head fell to the table. Talking through sobs, Defendant said he was "a free man right now," then spit into a cup and said, "I'm about to lose my life."
 

 The detectives kept telling Defendant he was making it hard on himself, and to think about God. Defendant told the detectives he was trying to help, and that he came voluntarily to talk. Defendant was then told that
 
 *631
 
 most people do not run, they talk, and that "we didn't call you and say hey Bobby I need to talk to you about this murder case, you're a suspect. Would you have come down? Probably not." Defendant was told the only way to "make it right" with God and with Defendant's children was to tell the detectives "how it went down." Defendant was then asked: "What you blubbering for?" "Bad news for you, Bobby, cause it's your DNA hooked to hers. Boom!" Defendant responded, crying, "I'm tore apart. I'm destroyed right now."
 

 Defendant was told: "There's only one thing to do in this room," and Defendant responded: "I know there's only one thing to do in this room." The detectives told Defendant that either he "goes down" or he "gives up the other two folks." Defendant continued crying with his head on the table and was told: "For us, this is the best interview in the world. We got you. You know we got you." The detectives then told Defendant how making a plea agreement worked, that not all cases went to trial, and that if Defendant wanted, they would go and get an assistant district attorney at that moment. After a couple of minutes, Defendant stated that if he admitted to committing the crime, he would go to prison for
 
 *647
 
 life or get the death penalty. After some more back and forth, Defendant was told, "you're trying to find another lie to tell me. You're stuttering."
 

 Several minutes later, Defendant was told: "You know it's over," and he responded: "I know it's over." The detectives then asked, "who else was with you that night?" After another long pause, Defendant again denied involvement, cried some more, and said, "that's all I got." After several minutes, the detectives told Defendant: "You are almost there." "We know what happened." "We're trying to be there for you." Detective Whitworth told Defendant: "I could have just come and locked you up but I don't do that to people because I'm an honorable man." Defendant said he could not keep repeating the same thing, and was told, "then don't, repeat the right thing." Defendant began crying again and indicated he felt suicidal.
 

 A couple of minutes later, Defendant was told it was not unusual for people to come in "and lie like you." Defendant cried some more and the detectives told him that his continued lying made the "best case for DA-you lie to us once on tape, lied again on tape-got your DNA." Defendant then said: "I know I'm dead," and the detectives told him he had the choice to cooperate or not, and asked him, "are you willing to wear this yourself?"
 

 Detective Ward asked Defendant if he thought he was going to be able to go home "today." When Defendant answered that he did not, he was told: "Then you're under arrest for murder." Detective Whitworth told him: "If you don't believe you can get up and walk out of here, then I have no choice. You just told me you believe you're going to jail." Detective Ward then asked Defendant: "Did you just say that, yes or no?" Defendant responded: "Yes, sir." Detective Ward responded: "Then I'm going to have to place you under arrest and then I've got some stuff to do before I continue." "Because to be voluntary you've got to believe you can walk out of here." Defendant said he believed he could go home but that he wanted to help because he believed he was the "star player." Detective Ward told Defendant that if he felt like he could leave, "we're good," but if he did not, "then we'll have to do something different." Defendant was then asked if he thought he could get up and walk out at any time, and Defendant responded, "not at any time, only after you free me to go." A visibly exasperated Detective Whitworth responded: "That's different, Bobby." He then asked Defendant again if he thought he could walk out at that moment, and Defendant responded in the affirmative. Defendant was then told: "Because if not, then we're going to have to go to the next level." Defendant later said he had "faith" that he
 
 *648
 
 could walk out, but also knew he could not provide what the detectives wanted and that he was confused.
 

 Defendant said, speaking about himself: "Right now it looks like Bobby did this because Bobby has DNA under the victim['s] ... nails." Several minutes later, the detectives told Defendant: "You did what you did." "You're full of sh*t." And: "You're done." The detectives again told Defendant they were certain they were talking to the
 
 *632
 
 right person, that Defendant was "choosing not to help" himself, and that he was lying. The detectives told Defendant: "All you can do is make it a little easier on you." They asked him: "Do you think it will go easier on you if you don't talk?" Defendant replied: "No[,]" and the detectives thanked him and said: "So you're listening to us." The detectives reiterated they were certain they were "talking to the right person" and that Defendant was not going to change their minds. The detectives told Defendant to "cut your losses. Help yourself."
 

 At approximately 12:20 p.m., the detectives told Defendant there would be no other interviews with him after that one, that someone would have to pay for the crime, and the nature of the punishment would depend on the individual. Defendant was told: "You told us things in these interviews that only the killer knows. It's that simple." "So is Bobby willing to help Bobby?" Defendant was again told to "cut his losses" and "get the best seat on the bus." Several minutes later, Defendant was told he had gotten away with murder for four years, was asked if he wanted to share the blame, and was told that the "DA wants to know who didn't cooperate; who did cooperate."
 

 The detectives told Defendant they did not "think" he was lying to them, they "knew" it. Defendant was told the "ball" was in his court and, after a long pause, Defendant was again asked if he wanted an assistant district attorney to come and tell him what was in his best interest. Defendant was told that coming clean would give him peace and closure, and that showing remorse would help "cleanse" his soul, and put him at "a higher level." At approximately 12:45 p.m., Defendant was told the district attorney would look at who had cooperated; if only one of the three involved had cooperated, the district attorney would go after the other two; if two of the three had cooperated, the district attorney would go after the uncooperative one. Several minutes later, the detectives asked: "Do you trust them that much?"
 

 Defendant then put his head on the table and went silent for a very long pause. One of the detectives touched Defendant, and Defendant
 
 *649
 
 said: "God," which was followed by minutes more of silence. At approximately 1:05 p.m. Defendant stated: "I'm dead." The detectives told him he would have to pay, but the question was how much; that it would be a question of cooperation versus non-cooperation. Defendant was again told it would be better for him if he cooperated. He was asked if he wanted the detectives to get an assistant district attorney, and was told by Detective Ward that, if he gave a truthful statement, "I'll work for you."
 

 The detectives told Defendant his record was not that bad, other than his prior murder conviction, and that the district attorney would consider that. Defendant was again told the detectives knew they were talking to the right person, and that Defendant knew he was the right person, too.
 

 The detectives left Defendant alone in the interrogation room at 1:15 p.m. and Defendant began to pray out loud. A few minutes later Defendant got up and asked if he could use the restroom, which he did, then returned to an empty interrogation room where he sat alone until 1:57 p.m., when Detective Ward returned alone and resumed talking to Defendant. Detective Ward showed Defendant two post-mortem photographs of Anita at approximately 2:01 p.m.
 

 At approximately 2:03 p.m., Detective Ward told Defendant he was placing him under arrest for Anita's murder, and Detective Ward had Defendant shackle himself to chains set in the interrogation room floor. Although Detective Ward had not yet given Defendant his
 
 Miranda
 
 warnings, he continued to talk to Defendant and listen to him for approximately eleven more minutes. Defendant told Detective Ward he could give him some answers if Detective Ward would allow him to call someone. Detective Ward told Defendant that he was not going to listen to lies. Defendant was told that he was not going to get to go home because murder suspects are generally held without bail.
 

 At approximately 2:14 p.m., Detective Ward began to read Defendant his
 
 Miranda
 
 rights, and Defendant signed a waiver of those rights at approximately 2:17 p.m. Detective Ward continued to question Defendant and told him he was trying to work with
 
 *633
 
 Defendant, and that cooperating would be the smartest thing. At approximately 2:22 p.m., Detective Ward told Defendant: "I felt like I had to make you a believer, you weren't believing us." "I felt in my heart like the only thing that's going to make you understand that this isn't going to go away is to charge you with murder. So I charged you with murder."
 
 *650
 
 Several minutes later, Detective Ward assured Defendant he did not "have a problem taking the stand on the behalf of a defendant." Detective Ward told Defendant that he could face either second-degree, first-degree, or capital murder and "that's why I'm ... beating my head against the wall trying to explain to you, help yourself. Put it into a better category for you." Detective Ward told Defendant he could not promise anything, but the district attorney would go easier on Defendant if Defendant was truthful. Defendant was told to "cut his losses," that if he was honest about what he had done, it would help him. Defendant was told not to "wear" the charge all by himself.
 

 At approximately 2:38 p.m., Defendant began crying again and told Detective Ward, "you have to get me a witness protection plan, though," then began sobbing. Defendant asked: "I'm already dead, should I just kill myself all the way?" At approximately 2:40 p.m., Defendant told Detective Ward, while sobbing, "I wasn't the gunman." Defendant then told Detective Ward that Tony and Josh were the other two men involved, asked Detective Ward for a hug, and sobbed on Detective Ward's shoulder. As indicated above, Defendant told the detectives that he had not killed Anita, and that he assumed Tony had been the one who shot her.
 

 Acting on information obtained from Defendant, the detectives located Tony and Josh and questioned them at the police station. Tony and Josh gave different accounts from each other when questioned by the police, and then gave different accounts when testifying at trial. When initially questioned, Josh told police he had handled a gun that night, and that the gun belonged to him. Josh testified that he first told the detectives that he shot Anita, but that this statement was not recorded. Josh then told police Tony had killed Anita; that Tony had told him "he [Tony] shot her[, but Tony] didn't know if he killed her or not." However, at trial, Josh testified he never touched a gun, that Defendant brought the gun, and that he did not know who shot Anita. Tony testified at trial that Defendant and Josh planned the robbery. Tony also testified that Josh never had a gun, but admitted he had previously told police that Josh "probably did have a gun[.]"
 

 When Josh testified at trial, he said that he, Tony, and Defendant walked to the motel and when they were beside the motel, Defendant pulled out a gun and said they should rob a man and a woman who were standing in the parking lot. Josh and Tony wore stocking caps, and Defendant wore a ski mask that covered his face. They all approached the man and woman in the parking lot and Defendant threatened them with his gun and told them to get on the ground; then Josh went through
 
 *651
 
 their pockets. Josh put the items he recovered into his own pockets, except a set of keys, which he gave to Defendant. Defendant told Josh to remain with the victims, and he and Tony went to the motel. Josh heard both a man and a woman screaming, and some gunfire. Defendant and Tony returned a few minutes later and the three men left together. Josh testified that Defendant attempted to rob another man who was approaching the motel, but the man ran away and Defendant fired his gun at the man, but missed. Defendant hid the gun under a brick beside an abandoned building. Josh testified he never had a gun that night, and that he never saw Tony with a gun.
 

 Tony's testimony was that he, Josh, and Defendant left a friend's house and headed toward the motel with the intention of committing a robbery. According to Tony's testimony, Defendant and Josh had come up with the plan. However, Tony then testified they all came up with the plan once they were at the motel. Tony testified Defendant hit the man in the head with his gun, then saw Josh doing something to the man and woman who were on the ground. Tony took the keys and attempted to unlock to door to the motel, and finally managed to find the correct key. He and Defendant went inside, and encountered a woman sleeping. Defendant went to the
 
 *634
 
 woman, and when she woke up "she was trying to get him off[,] and "she was screaming." Tony said he left the room to rejoin Josh, then they heard a gunshot and saw Defendant "coming out of the room running." The three men then ran away from the motel, but when they saw a man coming towards them, Defendant shot at the man twice. They went behind a building where Defendant hid the gun under a brick.
 

 Defendant filed a motion to suppress on 11 December 2014, arguing his statements to police should be suppressed because they were not voluntarily made. Defendant's motion specifically argued that Defendant was subjected to custodial interrogation before he was given his
 
 Miranda
 
 rights, and that Defendant's inculpatory statements were made pursuant to improper use of both threat and promise.
 

 Defendant's motion was heard 28 September 2015, and was denied by order entered 3 November 2015,
 
 nunc pro tunc
 
 , 29 September 2015. The trial court ruled that Defendant "was not in custody until the time that he was advised that he was under arrest and Mirandized at 2:14 p.m." The trial court further ruled that Defendant's inculpatory statements were made voluntarily, and not "obtained as a result of hope or fear instilled by the detectives." Defendant was tried and found guilty of first-degree murder on 6 October 2015. Defendant appeals.
 

 *652
 
 In Defendant's first argument, he contends the trial court erred in denying his motion to suppress. We agree, but hold the error was harmless.
 

 Our Supreme Court has stated the proper standard of review for denial of a motion to suppress as follows:
 

 The applicable standard in reviewing a trial court's determination on a motion to suppress is that the trial court's findings of fact "are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting." Any conclusions of law reached by the trial court in determining whether defendant was in custody "must be legally correct, reflecting a correct application of applicable legal principles to the facts found."
 

 State v. Barden
 
 ,
 
 356 N.C. 316
 
 , 332,
 
 572 S.E.2d 108
 
 , 120-21 (2002) (citations omitted). This Court has held:
 

 We review
 
 de novo
 
 a trial court's conclusions as to the voluntariness of a defendant's waiver of
 
 Miranda
 
 rights and statements. "The State bears the burden of proving that a defendant made a knowing and intelligent waiver of his rights and that his statement was voluntary." Where, as here, "a defendant's waiver of
 
 Miranda
 
 rights arises under the same circumstances as the making of his statement, the voluntariness issues may be evaluated as a single matter. Whether a waiver and statements were voluntarily made "must be found from a consideration of the entire record[.]" "[T]he reviewing court applies a totality-of-circumstances test."
 

 State v. Ingram
 
 , --- N.C.App. ----, ----,
 
 774 S.E.2d 433
 
 , 442 (2015) (citations omitted).
 

 There are a number of ... relevant factors [in determining the voluntariness of a statement]:
 

 whether defendant was in custody, whether he was deceived, whether his Miranda rights were honored, whether he was held incommunicado, the length of the interrogation, whether there were physical threats or shows of violence, whether promises were made to obtain the confession, the familiarity of the declarant with the criminal justice system, and the mental condition of the declarant.
 

 *653
 
 .... Furthermore, for a waiver of
 
 Miranda
 
 rights to be valid, it "must be ... given voluntarily 'in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception[.]' " "[W]here it appears that an incriminating statement was given under any circumstances indicating coercion or involuntary action, that statement will be inadmissible." "[T]he question of whether Defendant's incriminating statements were made voluntarily turns on an analysis of the circumstances Defendant was subjected to before making his incriminating statements and the impact those circumstances had upon him."
 

 *635
 

 Id.
 

 at 443
 
 ,
 
 774 S.E.2d at 442-43
 
 (citations omitted).
 

 In the present case, the trial court made the following relevant findings of fact:
 

 3. Det. Ward and another CMPD detective, Brian Whitworth ("Det. Whitworth") sought to make contact with the Defendant on October 19, 2011.
 

 4. The Defendant came to the police department headquarters on his own, without police escort, on October 24, 2011.
 

 5. The Defendant was not told he was under arrest.
 

 6. The Defendant was not shackled or handcuffed.
 

 7. At times, during the interview with Det. Ward and Det. Whitworth, both detectives left the interview room.
 

 8. There was not a guard or police officer stationed at the door to the interview room.
 

 9. The Defendant was in possession of his personal cell phone while inside the interview room.
 

 10. The Defendant was offered, and accepted, food and drink.
 

 11. The Defendant was not hesitant to engage with, or otherwise speak to, the detectives.
 

 12. At no point was the Defendant made any specific promises.
 

 *654
 
 ....
 

 18. At no time did the Defendant ask detectives to obtain for him, or to give him the opportunity to speak with, a defense lawyer.
 

 19. The Defendant was emotional at times.
 

 20. The Defendant cried at times.
 

 21. The Defendant expressed concern with his ability to "keep food down."
 

 22. The Defendant was 37 years old at the time of the interview.
 

 23. The Defendant is high-school-educated through the 11th grade and obtained his GED.
 

 24. The Defendant is articulate, intelligent, literate, and knowledgeable about the criminal justice system and its processes.
 

 25. Det. Ward had previously interviewed the Defendant, in 1993, about a murder unrelated to the above-captioned case.
 

 26. While there were no specific promises or threats made by law enforcement, the detectives conducting the interview did represent to the Defendant that the District Attorney "might look favorably" at the Defendant if he made a confession.
 

 27. At one point, the Defendant was patted down, as a matter of course, for safety purposes.
 

 28. Det. Ward had previously interviewed the Defendant, in 2007, about the above captioned case.
 

 29. During his 2007 interview, the Defendant did not admit any involvement in the above-captioned case.
 

 30. The Defendant had self-interest in staying and engaging with police in 2011.
 

 31. The Defendant offered to help, offered to wear a wire, and offered to do whatever else he could to assist the detectives.
 

 *655
 
 Defendant argues the trial court's findings of fact "seem to intentionally downplay the influence of hope and fear." Defendant specifically contends that findings of fact five, nineteen, twenty, twenty-one, and twenty-six are incorrect or incomplete.
 

 Defendant argues that finding five: "Defendant was not told he was under arrest," "is at best an incomplete finding as [Defendant] was told he would be arrested if he did not state that he was there voluntarily. [Defendant] was also told that he was guilty of murder and would 'pay the price.' " In order to evaluate Defendant's arguments, we have reviewed the relevant parts of the video recordings of Defendant's interview on 24 October 2011, which are set forth above. We note that Defendant
 
 was
 
 told that he was under arrest at approximately 2:03 p.m. Concerning the time prior to formal arrest, when Defendant was being interrogated, we agree with Defendant that whether or not he was specifically told he was under arrest, the detectives' statements to Defendant, along with the attendant circumstances, made Defendant's position akin to a formal arrest at a point early in the interview.
 

 *636
 
 Findings of fact nineteen, twenty, and twenty-one are all supported by competent evidence, though we agree with Defendant that finding Defendant "was emotional at times," and "cried at times" tends to understate Defendant's emotional state during much of the interview. Concerning Defendant's ability to keep food down, our review of the video interrogation demonstrates that Defendant did tell the detectives he felt sick to his stomach, and that he rejected an offer of food at one point, stating that he worried he would not be able to "keep it down." Defendant also on occasion spit into a cup in a manner indicating stomach upset. Finally, though we may agree with the wording of finding of fact twenty-six that "there were no
 
 specific
 
 promises or threats made by" the detectives (emphasis added), we agree with Defendant that viewing the totality of the circumstances, Defendant was induced by both fear and hope to make inculpatory statements to the detectives.
 

 Defendant was asked to "voluntarily" show up at the police department for an interview. What Defendant did not know at that time was that the police had received DNA evidence suggesting the overwhelming likelihood that Defendant's DNA had been recovered from underneath Anita's fingernails. Defendant did not know this at the time he was asked to "voluntarily" submit to an interview at the police station, so at the time Defendant arrived at the police station, a reasonable person in Defendant's situation would not have "believed that he was under arrest or was restrained in his movement to the degree associated with a formal arrest."
 
 Barden
 
 ,
 
 356 N.C. at 337
 
 ,
 
 572 S.E.2d at 123
 
 (citation omitted).
 

 *656
 
 What is clear to this Court, however, is that Defendant was not going to leave the police station that day without being placed under arrest for Anita's murder.
 

 As the State acknowledges:
 

 Both the United States Supreme Court and this Court have held that
 
 Miranda
 
 applies only in the situation where a defendant is subject to custodial interrogation.
 
 Miranda v. Arizona
 
 , 384 U.S. [436] at 444 [
 
 86 S.Ct. 1602
 
 , 1612] 16 L.Ed.2d [694] at 706 [ (1966) ] ;
 
 State v. Gaines
 
 ,
 
 345 N.C. 647
 
 , 661,
 
 483 S.E.2d 396
 
 , 404 (1997). The proper inquiry for determining whether a person is "in custody" for purposes of
 
 Miranda
 
 is "based on the totality of the circumstances, whether there was a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' " In this case, we must examine "whether a reasonable person in defendant's position, under the totality of the circumstances, would have believed that he was under arrest or was restrained in his movement to the degree associated with a formal arrest."
 

 Id.
 

 (citations omitted);
 
 see also
 

 J.D.B. v. North Carolina
 
 ,
 
 564 U.S. 261
 
 , 269-71,
 
 131 S.Ct. 2394
 
 , 2401-02,
 
 180 L.Ed.2d 310
 
 , 321-22 (2011).
 

 Approximately twenty minutes into the interview, Defendant was shown the DNA analysis indicating that his DNA had been recovered from under Anita's fingernails. This evidence, if true, placed Defendant not only at the scene of the murder, but in close physical proximity to the victim. We hold that at that time, "a reasonable person in [D]efendant's position, under the totality of the circumstances, would have believed that he was under arrest or was restrained in his movement to the degree associated with a formal arrest."
 
 Barden
 
 ,
 
 356 N.C. at 337
 
 ,
 
 572 S.E.2d at 123
 
 . A reasonable person, who had previously denied ever having had contact with a murder victim, when confronted with DNA evidence recovered from underneath that murder victim's fingernails, would not believe he was free to exit a police interrogation room and go home. At that point in time, Defendant should have been informed that he was under arrest and should have been provided his rights under
 
 Miranda
 
 .
 
 Id
 
 .
 

 We note that the detectives continued to reinforce the position that Defendant was not free to leave through their subsequent and continuing interrogation. At approximately 10:12 a.m., Detective Ward told Defendant that the DNA evidence locked Defendant in on charges of armed robbery and murder. The detectives told Defendant at
 
 *657
 
 approximately 10:16 a.m. that this case would be a capital murder case, and, unless Defendant wanted "to wear" the whole charge, Defendant
 
 *637
 
 needed to tell them who else was involved. In the next few minutes, the detectives told Defendant that his DNA under Anita's fingernails provided enough probable cause to charge Defendant for murder, and showed that Anita had grabbed Defendant's arm or his hair before she was murdered. Approximately thirty-one minutes into the interview, the detectives told Defendant that he should stop denying his participation, because he was so locked into the charges that he could not "get out with a blow torch." Detective Ward again told Defendant that this case would be a capital case, but Defendant could help himself by cooperating, and that district attorneys "will work with people who are honest and true." Defendant was challenged in this manner for over four hours, as thoroughly set out above, until he was finally told he was under arrest. Though we do not apply a subjective test, we note that Defendant was eventually placed under arrest and
 
 Mirandized
 
 , even though he had continued to deny involvement in Anita's murder from the time his interrogation began until he was placed under arrest.
 

 Defendant argues that
 
 Missouri v. Seibert
 
 ,
 
 542 U.S. 600
 
 ,
 
 124 S.Ct. 2601
 
 ,
 
 159 L.Ed.2d 643
 
 (2004), renders his inculpatory statements involuntary. In
 
 Seibert
 
 , the United States Supreme Court stated that the "technique of interrogating in successive, unwarned and warned phases raises a new challenge to
 
 Miranda.
 
 "
 
 Id
 
 . at 609,
 
 124 S.Ct. at 2608
 
 ,
 
 159 L.Ed.2d at 653
 
 . In
 
 Seibert
 
 , detectives first questioned the defendant without
 
 Miranda
 
 warnings until he confessed, then detectives got the
 
 Mirandized
 
 defendant to repeat his confession. This technique was
 

 a police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession. Although such a statement is generally inadmissible, since taken in violation of
 
 Miranda
 
 , the interrogating officer follows it with
 
 Miranda
 
 warnings and then leads the suspect to cover the same ground a second time.
 

 Id.
 

 at 604
 
 ,
 
 124 S.Ct. at 2605
 
 ,
 
 159 L.Ed. 2d at 650
 
 (citation omitted). The Supreme Court held:
 

 By any objective measure, applied to circumstances exemplified here, it is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content. After
 
 *658
 
 all, the reason that question-first is catching on is as obvious as its manifest purpose, which is to get a confession the suspect would not make if he understood his rights at the outset; the sensible underlying assumption is that with one confession in hand before the warnings, the interrogator can count on getting its duplicate, with trifling additional trouble. Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again. A more likely reaction on a suspect's part would be perplexity about the reason for discussing rights at that point, bewilderment being an unpromising frame of mind for knowledgeable decision. What is worse, telling a suspect that "anything you say can and will be used against you," without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail. Thus, when
 
 Miranda
 
 warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and "depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." By the same token, it would ordinarily be unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because
 
 Miranda
 
 warnings formally punctuate them in the middle.
 

 Id.
 

 at 613-14
 
 ,
 
 124 S.Ct. at 2610-11
 
 ,
 
 159 L.Ed. 2d at 655-56
 
 (citations omitted).
 

 We agree that the detectives in the present case used the same objectionable technique considered in
 
 Seibert
 
 . However, unlike
 
 *638
 
 in
 
 Seibert
 
 , Defendant in the present case did not confess until after he was given his
 
 Miranda
 
 warnings. For this reason, our analysis is whether the entirety of the interrogation, from when Defendant first should have been
 
 Mirandized
 
 , up until his inculpatory statements, rendered Defendant's inculpatory statements involuntary, even without Defendant having confessed prior to having been
 
 Mirandized
 
 .
 

 We hold that resolution of the present case is determined by precedent, which is partially analyzed in
 
 State v. Pruitt
 
 ,
 
 286 N.C. 442
 
 ,
 
 212 S.E.2d 92
 
 (1975). In
 
 Pruitt
 
 , there was
 

 *659
 
 plenary evidence that the procedural safeguards required by the
 
 Miranda
 
 decision were recited by the officers and that defendant signed a waiver stating that he understood his constitutional rights, including his right to counsel. Even so, the ultimate test of the admissibility of a confession still remains whether the statement made by the accused was in fact voluntarily and understandingly made.
 

 Id
 
 . at 454,
 
 212 S.E.2d at 100
 
 (citation omitted). Our Supreme Court in
 
 Pruitt
 
 reasoned:
 

 Another case factually similar to the case now before us is State v. Stevenson,
 
 212 N.C. 648
 
 ,
 
 194 S.E. 81
 
 [ (1937) ]. There the evidence tended to show that the defendant had started to make a statement while in jail and was told by an officer that he need not lie because the officer already had more than enough evidence for his conviction. The defendant thereupon confessed. This Court awarded a new trial on the ground that the confession was not a free and voluntary confession but was instead a product of unlawful inducement on the part of the law enforcement officer.
 

 In
 
 State v. Drake
 
 ,
 
 113 N.C. 625
 
 [624],
 
 18 S.E. 166
 
 [ (1893) ], the facts showed that while the defendant was being carried from the place of his arrest to a Justice of the Peace, a law enforcement officer said to him, 'If you are guilty, I would advise you to make an honest confession. It might be easier for you. It is plain against you.' At that time the defendant denied his guilt, but after the Justice of the Peace had committed him to jail, he confessed. The Court again held the confession to be involuntary and, in part, stated:
 

 "... The assertion of his innocence, in reply to the proposition that he should confess and thus make it easier for him, does not at all prove that the offer of benefit from the officer who had him in charge did not find a lodgment in his mind. If so, what could be more reasonable than that when he found himself on the way to prison in charge of the author of this hope that a confession would alleviate his condition, he should be tempted to act then upon a suggestion that he had rejected when the prospect did not seem to him so dark, and make a confession. It
 
 may
 
 have proceeded from this cause, from this hope so held out to him. If it
 
 *660
 

 may
 
 have proceeded from that cause, there is no guaranty of its truth, and it must be rejected."
 

 In
 
 State v. Livingston
 
 ,
 
 202 N.C. 809
 
 ,
 
 164 S.E. 337
 
 [ (1932) ], the defendants were arrested, and after measuring their shoes and tracks at the scene of the crime, the officers told defendants that "it would be lighter on them to confess" and that "it looks like you had about as well tell it." The defendants forthwith confessed to the crime charged. There the Court ... held that the confessions were involuntary and inadmissible in evidence.
 
 Accord: State v. Fox, Supra
 
 (Officer told defendant that it would be better for him in court if he told the truth and that he might be charged with a lesser offense of accessory to the homicide charge rather than its principal.);
 
 State v. Fuqua
 
 ,
 
 269 N.C. 223
 
 ,
 
 152 S.E.2d 68
 
 [ (1967) ] (A police officer told the incarcerated defendants that he [the officer] would be able to testify that they cooperated if they aided the State in its case.);
 
 State v. Woodruff
 
 ,
 
 259 N.C. 333
 
 ,
 
 130 S.E.2d 641
 
 [ (1963) ] (Officer obtained favors and concessions on the part of State officials to induce defendant to aid in solving the homicide and promised that if the evidence obtained involved defendant, he would try to help defendant.);
 
 State v. Davis
 
 ,
 
 125 N.C. 612
 
 ,
 
 34 S.E. 198
 
 [ (1899) ] (Officer told defendant that he had "worked up the case, and he had as well tell all about it.").
 

 *639
 
 The rule set forth in
 
 Roberts
 
 has been consistently followed by this Court. The Court has, however, made it clear that custodial admonitions to an accused by police officers to tell the truth, standing alone, do not render a confession inadmissible. Furthermore, this Court has made it equally clear that any improper inducement generating hope must promise relief from the criminal charge to which the confession relates, not to any merely collateral advantage.
 

 In instant case the interrogation of defendant by three police officers took place in a police-dominated atmosphere. Against this background the officers repeatedly told defendant that they knew that he had committed the crime and that his story had too many holes in it; that he was "lying" and that they did not want to "fool around." Under these circumstances one can infer that the language used by the officers tended to provoke fright. This language was then tempered by statements that the officers considered
 
 *661
 
 defendant the type of person "that such a thing would prey heavily upon" and that he would be "relieved to get it off his chest." This somewhat flattering language was capped by the statement that "it would simply be harder on him if he didn't go ahead and cooperate." Certainly the latter statement would imply a suggestion of hope that things would be better for defendant if he would cooperate,
 
 i.e.
 
 , confess.
 

 We are satisfied that both the oral and written confessions obtained from defendant were made under the influence of fear or hope, or both, growing out of the language and acts of those who held him in custody. We hold that both the oral and the written confessions obtained in the Sheriff's Department on 9 October 1973 were involuntary and that it was prejudicial error to admit them into evidence.
 

 Id
 
 . at 456-58,
 
 212 S.E.2d at 101-03
 
 (citations omitted). We hold that the circumstances in the present case were at least as coercive as those in
 
 Pruitt
 
 . In the present case, Defendant was questioned for hours after he should have been
 
 Mirandized
 
 and, throughout this questioning, the detectives repeatedly told Defendant they knew he was lying; that they had DNA proof of Defendant's guilt; that only a guilty person would have known Anita was shot in the back of the neck; that this could be a capital case, and that Defendant's treatment would depend on his cooperation; that the district attorney's office would usually work with those who cooperated; that Detective Ward would consider testifying on Defendant's behalf;
 
 [3]
 
 that Defendant would feel better if he confessed and did right by God and his children; and that Defendant should get the "best seat on the bus" by giving statements against the two other men involved. It is also clear that the detectives decided to arrest Defendant at the time they did in order to shake him up and, in Detective Ward's words: "I felt in my heart like the only thing that's going to make you understand that this isn't going to go away is to charge you with murder. So I charged you with murder."
 
 [4]
 

 *662
 
 The facts before us are in contrast to those in cases where a defendant's statements were found to have been voluntary:
 

 Unlike the situations in
 
 Pruitt
 
 and
 
 Stevenson
 
 , the detective did not accuse defendant of lying, but rather informed defendant of the crime with which he might be charged and urged him to tell the truth and think
 
 *640
 
 about what would be better for him. Further, at the time Howard made the statements defendant contends were coercive, Howard had already identified for defendant, and defendant had acknowledged, the others with him the night of the murder. Earlier in the interview Howard had stated:
 

 What I want to talk with you about is when you and Chuck and Brian and Bootsy and another guy from Clayton by the name of Brian Barbour come to Raleigh and ya'll robbed an old man and hit him with a bat. That's the incident I'm talking about, okay?
 

 Shortly thereafter, Howard asked defendant, "So who was together? Who was with ya'll that night?" Defendant responded, "Everybody that you named." Defendant knew at that point that the State had at least one witness.
 

 ....
 

 Under the totality of the circumstances test, the isolated statements by Howard do not support defendant's contention that his statements were made involuntarily out of fear or hope on the part of defendant. We conclude, therefore, that the trial court did not err in determining that the statements were freely and voluntarily given and in denying defendant's motion to suppress.
 

 State v. McCullers
 
 ,
 
 341 N.C. 19
 
 , 28,
 
 460 S.E.2d 163
 
 , 168 (1995) ;
 
 see also
 

 State v. Thomas
 
 ,
 
 310 N.C. 369
 
 , 379,
 
 312 S.E.2d 458
 
 , 464 (1984) ("In
 
 Pruitt
 
 , unlike the case before us, the police repeatedly told defendant that they knew that he had committed the crime and that his story had
 
 *663
 
 too many holes in it; that he was 'lying' and that they did not want to 'fool around.' In addition, the officers told defendant in that case that 'it would simply be harder on him if he didn't go ahead and cooperate.' ") (citations and quotation marks omitted);
 
 Flood
 
 , 237 N.C.App. at 296-99, 765 S.E.2d at 72-74 (lengthy analysis of
 
 Pruitt
 
 and other relevant opinions);
 
 State v. Patterson
 
 ,
 
 146 N.C.App. 113
 
 , 124,
 
 552 S.E.2d 246
 
 , 255 (2001) ("In
 
 Pruitt
 
 , the investigating officers repeatedly told defendant that they knew that he had committed the crime and that his story had too many holes in it; that he was 'lying' and that they did not want to 'fool around.' They also told him that they considered [him] the type of person 'that such a thing would prey heavily upon' and that he would be 'relieved to get it off his chest.' The Court found that under these circumstances the defendant's confessions were made under the influence of fear or hope, or both, growing out of the language and acts of those who held him in custody.") (citations and quotation marks omitted).
 

 The fact that the detectives at times managed to get Defendant to state that he thought he could leave does not change our analysis.
 
 J.D.B.
 
 ,
 
 564 U.S. at 271
 
 ,
 
 131 S.Ct. at 2402
 
 ,
 
 180 L.Ed.2d at 322
 
 ("[T]he 'subjective views harbored by either the interrogating officers or the person being questioned' are irrelevant. The test, in other words, involves no consideration of the 'actual mindset' of the particular suspect subjected to police questioning."). Based upon
 
 Pruitt
 
 and other cited cases, we hold that Defendant's inculpatory statements "were made under the influence of fear or hope, or both, growing out of the language and acts of those who held him in custody."
 
 Pruitt
 
 ,
 
 286 N.C. at 458
 
 ,
 
 212 S.E.2d at 103
 
 . Defendant's motion to suppress his confession should have been granted.
 

 Because we have held that Defendant's constitutional rights were violated by the failure to suppress his inculpatory statements, it is the State's burden to prove this error was harmless beyond a reasonable doubt. " 'A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless.' N.C.G.S. § 15A-1443(b) (2011)."
 
 State v. Ortiz-Zape
 
 ,
 
 367 N.C. 1
 
 , 13,
 
 743 S.E.2d 156
 
 , 164 (2013). In its brief, the State incorrectly attempts to place this burden on Defendant. However, we hold that the overwhelming evidence of Defendant's guilt of first-degree murder, based upon the evidence that Anita was murdered in the course of a robbery in which Defendant played an essential part, renders this error harmless beyond a reasonable doubt.
 

 *664
 
 Both Josh and Tony, whose testimony Defendant did not move to suppress, identified
 
 *641
 
 Defendant as the third man involved in the robbery and shooting, and both stated Defendant was wearing a mask that covered his face. They both testified that Defendant and Tony entered the motel while Josh remained outside, and both claimed Defendant was carrying a gun. Brandy testified that there were two younger men without their faces covered, and an older, larger man whose face was covered by a mask. Brandy testified it was the older, larger man who held the gun, and who entered the motel with one of the younger men. Most importantly, Defendant's DNA
 
 [5]
 
 was recovered from under Anita's fingernails. Although Defendant's admission of participation in the crime, which we have held was involuntary, clearly prejudiced Defendant, in light of the overwhelming evidence presented pointing to Defendant as one of the three men involved in the robbery and murder, we hold the prejudice to Defendant was harmless beyond a reasonable doubt. We reach this holding on these particular facts, and because the jury was instructed on acting in concert and felony murder based upon killing in the course of a robbery. The State did not have to prove that Defendant shot Anita, only that he was one of the three men involved in the robberies and murder. The evidence that Defendant was one of the three men involved was overwhelming, and the State has shown beyond a reasonable doubt that Defendant would have been convicted even had his motion to suppress his inculpatory statements been granted.
 

 In Defendant's second argument, he contends the trial court erred in excluding evidence of bullet fragments recovered from the parking lot that might have indicated the presence of a second gun at the crime scene. We disagree.
 

 Defendant argues he could have used this evidence to impeach the testimonies of Josh and Tony. Even assuming
 
 arguendo
 
 that there was a second gun involved in the crime, the State did not need to prove that Defendant was the person who shot Anita in order to obtain a conviction against him for first-degree murder, nor would the presence of an additional gun have weakened the plenary evidence of Defendant's involvement. This argument is without merit.
 

 The trial court erred in denying Defendant's motion to suppress his inculpatory statements, but we hold this error was harmless in light of the plenary additional evidence of Defendant's guilt. For the same reason, we hold that, even assuming
 
 arguendo
 
 the trial court erred in
 
 *665
 
 excluding evidence of bullet fragments recovered from the parking lot, any such error was harmless.
 

 NO PREJUDICIAL ERROR.
 

 Judges STROUD and INMAN concur.
 

 [1]
 

 The DNA recovered was identified as having come from three separate individuals, one of whom was Anita. Defendant was identified as the likely (one in over sixteen million chance) contributor of the second profile. The third profile was never matched to anyone.
 

 [2]
 

 Throughout the interview, the detectives referred to Defendant as "Bobby." At times, Defendant referred to himself as "Bobby."
 

 [3]
 

 See
 

 State v. Flood
 
 ,
 
 237 N.C.App. 287
 
 , 297,
 
 765 S.E.2d 65
 
 , 73 (2014),
 
 disc. review denied,
 

 368 N.C. 245
 
 ,
 
 768 S.E.2d 854
 
 (2015) (citing
 
 State v. Fuqua,
 

 269 N.C. 223
 
 , 228,
 
 152 S.E.2d 68
 
 , 72 (1967) ) "(statements inadmissible where an officer offered to testify on the suspect's behalf if he cooperated)."
 

 [4]
 

 See
 

 Pruitt
 
 ,
 
 286 N.C. at 457
 
 ,
 
 212 S.E.2d at 102
 
 (citation and quotation marks omitted) ("The assertion of his innocence, in reply to the proposition that he should confess and thus make it easier for him, does not at all prove that the offer of benefit from the officer who had him in charge did not find a lodgment in his mind. If so, what could be more reasonable than that when he found himself on the way to prison in charge of the author of this hope that a confession would alleviate his condition, he should be tempted to act then upon a suggestion that he had rejected when the prospect did not seem to him so dark, and make a confession. It
 
 may
 
 have proceeded from this cause, from this hope so held out to him. If it
 
 may
 
 have proceeded from that cause, there is no guaranty of its truth, and it must be rejected.").
 

 [5]
 

 To a stated certainty of 1 in 16,600,000 African-Americans, and all evidence presented demonstrated that all three of the men involved were African-American.